923 A.2d 939

MONTGOMERY MUTUAL INSURANCE COMPANY

v.

Josephine CHESSON, et al.

No. 110, Sept. Term, 2006.

Court of Appeals of Maryland.

May 23, 2007.

Nancy J. Courson (Dirska & Levin, Columbia), on brief, for petitioner.

Jerome A. Murphy, William L. Anderson, Crowell & Moring, LLP, Washington, DC, brief of The Coalition for Litigation Justice, Inc., for petitioner, amicus curiae.

John Parker Sweeney, Benjamin A. Homola, Miles & Stockbridge, P.C., Baltimore, T. Sky Woodward, Miles & Stockbridge, P.C., Towson, brief of Maryland Defense Counsel, Inc., National Association of Home Builders, and The National Multi Housing Council, for petitioner, amici curiae.

Gerald F. Gay (Arnold, Sevel & Gay, P.A., Baltimore), on brief, for respondents.

Timothy J. Hogan, James A. Lanier, Law Offices of Peter T. Nicholl, Baltimore, Bruce M. Bender, Van Grack, Axelson, Williamowsky, Bender & Fishman, P.C., Rockville, James K. MacAlister, Baltimore, brief of Maryland Trial Lawyers Association, for respondents, amicus curiae.

Argued before BELL, C.J., RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE and ALAN M. WILNER (Retired, specially assigned), JJ.

RAKER, J.

This appeal arises from a final judgment in a workers' compensation matter in which a jury in the Circuit Court for Howard County returned a verdict in favor of respondents and against the Baltimore Washington Conference of the United Methodist Church and Montgomery Mutual Insurance Company. Respondents claimed that they each had sustained an accidental injury or occupational disease, known as "sick building syndrome,"[1] arising out of and in the course of their

---

1. Sick building syndrome refers to a combination of ailments associated with exposure to modern buildings that lack proper ventilation. The World Health Organization has identified sick building syndrome as an excess of irritation of the skin and mucous membranes and other symptoms, including headache, fatigue, and difficulty concentrating. World Health Organization Regional Office for Europe, *Indoor air pollutants: exposure and health effects*, EURO Reports and Studies No. 78, p. 23–26 (1983), *available at* http://whqlibdoc.who.int/euro/r&s/ EURO_R&S_78.pdf.

employment, due to exposure to toxic mold. The issue presented in this case is whether the Circuit Court abused its discretion by not holding a *Frye–Reed* hearing pursuant to our holding in *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978), to determine the admissibility of the testimony of respondents' expert, Ritchie Shoemaker, M.D., and specifically, to decide whether the doctor's methodologies used for diagnosis and theories regarding the causal connection between mold exposure and certain human health effects are generally accepted in the scientific community for that purpose. We shall hold that the expert's testimony should have been the subject of a *Frye–Reed* hearing.

## I.

Respondents, Josephine Chesson, Martha Knight, Carole Silberhorn, Linda Gamble, Kenneth Lyons, and Connie Collins, were employees of the Baltimore Washington Conference of the United Methodist Church, and worked at the Church's offices located at 9720 Patuxent Woods Parkway, Columbia, Maryland. On November 18, 2002, several employees working in the office building noticed a foul odor emanating from the walls. A maintenance crew broke through an interior wall and discovered two types of mold, Aspergillus and Stachybotrys.

Respondents each filed a claim with the Maryland Worker's Compensation Commission, alleging that they had sustained an accidental injury or occupational disease known as sick building syndrome due to mold exposure on November 18, 2002. *See* Md.Code (1999, 2006 Cum.Supp.) § 9–101 *et seq.* of the Labor and Employment Article. The Workers' Compensation Commission held a hearing and disallowed two of respondents' claims and awarded partial compensation to the remaining respondents after finding accidental injury or occupational disease due to mold exposure.[2] Each respondent

---

2. The Workers' Compensation Commission found that respondents Connie Collins and William Lyons suffered neither an accidental injury nor an occupational disease due to mold exposure. The Commission found that respondents Josephine Chesson, Martha Knight, and Carole

filed a petition for judicial review in the Circuit Court for Howard County, *see* Md.Code (1999, 2006 Cum.Supp.) § 9–737 *et seq.* of the Labor and Employment Article, and a joint motion to consolidate the claims.

The Circuit Court consolidated the claims.[3] Each respondent had been examined and treated by Dr. Ritchie Shoemaker, a licensed medical doctor and board-certified physician in the field of family medicine. Prior to trial, petitioner filed a motion *in limine* seeking to exclude the testimony of Dr. Shoemaker on the grounds that his theories and methodologies for diagnosis regarding a causal connection between mold exposure and certain human health effects had not been generally accepted within the relevant scientific community. Petitioner requested a *Frye–Reed* hearing, addressing the court as follows:

"[DEFENSE COUNSEL]: The diagnosis of sick building syndrome, or bio toxic illness, assumes the causal relationship of the symptoms, to the bio toxic illness. It's—the diagnosis in itself, of the bio toxic illness, is that this particular illness exists, as a legitimate illness. Unfortunately, the ICD–9 classifications, which lists all diagnosis, for all illnesses, do not recognize bio toxic illness as an illness. It's also not recognized by the CDC, the Institute of Medicine, and NIOSH, The National Institute of Occupational Safety and Health.

Arrival at that diagnosis of bio toxic illness, uses techniques not generally accepted by the scientific community, which is the *Frye–Reed* test.

Dr. Shoemaker focuses on a constellation of symptoms as being caused by bio toxic illness. This constellation of symptoms is not accepted as an illness from mold. The

Silberhorn suffered accidental injury due to mold exposure, and that respondent Linda Gamble suffered from an occupational disease and not accidental injury due to mold exposure.

3. The following cases were consolidated with the present case: 13–C–03–56904, 13–C–03–56955, 13–C–03–56956, 13–C–03–57033, 13–C–03–57043, 13–C–04–57483, 13–C–04–57784, and 13–C–04–60173.

fundamental principles of differential diagnosis require that you rule out other causes of illnesses from symptoms that are presented from the patient. The first thing you would do is rule out known illnesses, not an illness that you happen to have made up yourself, and that is not accepted by the ICD–9 classifications. For example, the symptoms presented by these claimants could include: allergic rhinitis, sinusitis, stress at the belief of being ill; those illnesses were not even considered by Dr. Shoemaker. He took the constellation—

THE COURT: Excuse me, wouldn't that go to the weight, rather than the admissibility of his opinion?

[DEFENSE COUNSEL]: No, because you must base your opinion on accepted medical and scientific data. Using a constellation of symptoms, and concluding that it's sick building syndrome, is not a generally accepted method for diagnosis. The generally accepted method for diagnosis is to rule out different illnesses that are accepted as illnesses. In addition, accepting a patient's prior medical history just by having them tell you, without verifying the accuracy of the information, is not a generally accepted form of diagnosis. Dr. Shoemaker, by his own admission, reviewed no medical evidence, whatsoever, concerning prior illnesses. In addition, he prescribes a drug, Cholestyramine, for the treatment of bio toxic illness, and the FDA has not approved Cholestyramine for the treatment of bio toxic illness because, of course, they don't recognize bio toxic illness as a legitimate illness.

The modifying of the accepted diagnostic tools, also comes under a *Frye–Reed* evaluation, and that is exactly what Dr. Shoemaker is doing. He's saying, look there's five thousand tests of the visual-contrast sensitivity test. There's, you know, four thousand studies on Cholestyramine, but what he is not telling you, is that those studies are being modified for his use; his use is unique, and new, it's a new scientific technique and it should be looked at under the *Frye–Reed* test.

When we look at these issues with diagnosis and treatment, we haven't even gotten yet to his expression of 'causal relationship.' If he can separate out where he has diagnosis, and then goes to 'causal relationship,' I'd sure like to see it, because by the time these people even got to him, he had already diagnosed sick building syndrome. He sent out the questionnaires, they filled them out, and sent them back, or brought them back and, by that time, he found sick building syndrome. He didn't do any differential diagnosis, even though he says he did. He didn't do any testing that is accepted as—by the general scientific community for mold related illnesses, such as: allergy testing, spirometry testing—he decides that blood work is the way to go with mold. That visual-contrast sensitivity tests, which are used to test the vision of pilots, is what is used for mold. That—those techniques, though they may be established for other causes, have been modified for Dr. Shoemaker's purposes and, therefore, they should be under the *Frye–Reed* evaluation.

His tests, and his methods are completely experimental. He is the self-proclaimed forerunner in this area of law. He admits that he's the one that developed this—

\* \* \*

The problem with Dr. Shoemaker's experience is it's all anecdotal. The anecdotal evidence that he sees from treating people with Physteria and from what he sees—

THE COURT: Physteria were the fish down in Pocomoke City, or the Pocomoke River, or something?

[DEFENSE COUNSEL]: That's correct—

THE COURT:—or the Chesapeake Bay?

[DEFENSE COUNSEL]: That's correct—

THE COURT: Yeah—

[DEFENSE COUNSEL]:—that's right. And he uses that anecdotal evidence and anecdotal evidence from his treatment of mold patients. The problem with that is, it assumes that the test he uses to get to those diagnoses are,

generally accepted and they're not the generally accepted way to diagnose a mold related illness, which is to look at the prior medical records, physically look at them, see what these people have been experiencing prior to the mold exposure. It's to do allergy testing, spirometry testing, and then come up with a differential diagnosis by excluding known illnesses, not by automatically assuming that this constellation of symptoms means sick building syndrome.

\* \* \*

THE COURT: Well, if I were going to—before I could do what you're asking me to do, if indeed, this would have to be submitted to the *Frye–Reed* analysis, then would I not have to have a *Frye–Reed* hearing, as opposed to just say, 'oh, well, I agree with you,' wouldn't I be entitled to have a *Frye–Reed* hearing?

[DEFENSE COUNSEL]: We can bring our experts in, Your Honor, and Dr. Shoemaker is already on video."

Respondents maintained that because Dr. Shoemaker's opinion was a medical opinion, offered as that of a general practitioner and treating physician, the testimony was admissible and not the proper subject of a *Frye–Reed* hearing.

The Circuit Court agreed with respondents and denied petitioner's request for a *Frye–Reed* hearing. The court reasoned as follows:

"I'm prepared to rule on the motion *in limine,* and I'm satisfied, from the evidence. I'm going to deny the motion *in limine* to exclude the testimony of Dr. Ritchie Shoemaker, and I have reviewed the entire submissions and responses, and the cases that you've cited, and also have reviewed, with interest, the deposition of Dr. Shoemaker, and I'm satisfied, from the evidence that, regardless of where he starts, that Dr. Shoemaker has people fill out a form, which is not an uncommon practice among physicians, or physician's offices, but—he then goes on and he takes a history, and—of the patients, and he physically examines them, and

then does testing, and the particular tests that he uses are different various and sundry blood tests.

* * *

And he also indicated that he's spending, approximately, seventy-five percent of his professional time, now, dealing with bio toxic related illness.

His particular entry into this area, and notoriety, came with the Physteria problem in Maryland, and I noted, in reviewing his deposition, that he had a particular interest in wetlands, and causal relationship with that regard.

But we're talking about a board-certified physician, who has devoted, apparently, in the last five or six years, more than fifty percent of his time to this area of specialty, and I'm satisfied that this is not a *Frye–Reed* situation, it's 'diagnosis by a medical practitioner,' and he, while they have not adopted, or adapted his publications, and things that he has developed; he's published widely in this field, he's gone to law school, and consulted, and he's indicated he's worked with a number of other doctors in this area; I'm satisfied that he's qualified to render opinions in this area, and his opinions would be admissible in the things you mentioned that go to their weight, rather than their admissibility. So I am going to deny the motion *in limine.*"

The case proceeded to trial and Dr. Shoemaker's testimony was admitted on behalf of respondents. The jury returned verdicts in favor of each respondent, finding a causal relationship between mold exposure and certain illnesses claimed by respondents.[4]

---

**4.** The jury found that mold exposure on the date of November 18, 2002 caused a neuro-cognitive condition in Carole Silberhorn, a musculo-skeletal and neuro-cognitive condition in Martha Knight, a musculo-skeletal and neuro-cognitive condition in Josephine Chesson, an accidental injury that resulted in a respiratory condition in William Lyons, an accidental injury that resulted in a neuro-cognitive condition in Linda Gamble, and an accidental injury that resulted in a respiratory and neuro-cognitive condition in Connie Collins.

Petitioner noted a timely appeal to the Court of Special Appeals. Before that court, petitioner raised the argument he raises before this Court: that the Circuit Court erred when it accepted Dr. Shoemaker as an expert witness without first holding a *Frye–Reed* hearing to determine whether his medical opinions and methods of diagnosing patients are generally accepted within the scientific community. The intermediate appellate court rejected petitioner's argument, stating as follows:

"As in the case *sub judice,* we have previously held that expert opinions concerning the cause or origin of an individual's condition are not subject to *Frye–Reed* analysis. In *Myers v. Celotex Corp.,* 88 Md.App. 442, 460, 594 A.2d 1248 (1991), *cert. denied, Fibreboard Corp. v. Myers,* 325 Md. 249, 600 A.2d 418 (1992), we reversed the trial court's exclusion of appellant's expert causation opinion regarding asbestos exposure and cancer. In distinguishing the facts of *Myers* from a case that would invoke a *Frye–Reed* analysis, we explained that the fact that 'exposure to asbestos may cause cancer ... is not a novel or controversial assertion, nor is it a conclusion personal to Dr. Schepers.' *Id.* at 458, 594 A.2d 1248. We also stressed that the *Reed* holding had 'not been extended to medical opinion evidence which [was] not presented as a scientific test [,] the results of which were controlled by inexorable, physical laws.' *Id.* at 458–59, 391 A.2d 364 (citation and quotation marks omitted).

\* \* \*

We revisited *Myers* in the case of *CSX Transp., Inc. v. Miller,* 159 Md.App. 123, 858 A.2d 1025 (2004), *cert. granted,* 384 Md. 581, 865 A.2d 589 (2005), *cert. dismissed,* 387 Md. 351, 875 A.2d 702 (2005), in which we affirmed the trial court's acceptance of expert medical opinion testimony. Referring to our opinion in *Myers,* Judge Moylan reiterated:

A doctor's opinion as to the etiology of his patient's arthritis is simply not the type of thing contemplated by the phrase 'new and novel scientific technique [required

by the *Frye–Reed* test].' What is contemplated are new, and arguably questionable, techniques such as lie detector tests, breathalyzer tests, paraffin tests, DNA identification, voiceprint identification, as in the *Reed* case itself, and the use of polarized light microscopy to identify asbestos fibers . . .

> *Id.* at 187, 858 A.2d 1025."

*Montgomery Mutual v. Chesson,* 170 Md.App. 551, 569–70, 907 A.2d 873, 884 (2006). The Court of Special Appeals concluded that a *Frye–Reed* hearing was not necessary to address Dr. Shoemaker's theory of causation because that was part of his medical diagnosis, and that the Circuit Court committed no error in denying the motion *in limine* because Dr. Shoemaker utilized medical tests that are generally accepted in the scientific community. *Id.* at 560, 907 A.2d at 878.

Montgomery Mutual Insurance Company filed a petition for writ of certiorari before this Court. We granted that petition to address the following question:

> "Whether the Court of Special Appeals erred in holding that Dr. Ritchie Shoemaker's own, unsupported, testimony about his practices and expertise renders his opinions concerning mold related illnesses admissible without the necessity of a *Frye–Reed* analysis."

*Montgomery Mut. v. Chesson,* 396 Md. 12, 912 A.2d 648 (2006).

## II.

Before this Court, petitioner argues that the Circuit Court should have held a *Frye–Reed* hearing to determine the admissibility of Dr. Shoemaker's testimony. Petitioner states that under a proper *Frye–Reed* analysis, Dr. Shoemaker's testimony should have been excluded from trial because his methodologies, techniques, and tests used to formulate his opinions regarding mold exposure and sick building syndrome

have not been generally accepted in the scientific community.[5] Petitioner argues that it was, at a very minimum, entitled to demonstrate at an evidentiary hearing before the Circuit Court the basis for its argument that Dr. Shoemaker should not have been permitted to testify.

Respondents contend that *Frye–Reed* applies only to the appropriateness of new scientific techniques, and that there was no need for a *Frye–Reed* hearing in this case because Dr. Shoemaker based his diagnosis on techniques which are generally accepted in the scientific community. Respondents argue that Dr. Shoemaker's medical opinion concerning causation—*i.e.*, that exposure to mold caused sick building syndrome in respondents-was not a proper topic for a *Frye–Reed* hearing.

## III.

■ Maryland Rule 5–702 addresses the testimony of expert witnesses at trial. The Rule provides as follows:

"Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine

(1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education,

(2) the appropriateness of the expert testimony on the particular subject, and

---

**5.** Petitioner's two main contentions in this regard are as follows: (1) although some of the tests used by Dr. Shoemaker may be accepted in and of themselves for other purposes in the scientific community as a whole, *e.g.*, visual-contrast sensitivity testing, they are not accepted as reliable or relevant in the diagnosis of sick building syndrome or all of the particular symptoms claimed by respondents, and (2) Dr. Shoemaker's use of patient histories and administration of a certain drug, Cholestyramine, which he employed in his earlier work diagnosing human disease allegedly caused by Physteria, is not accepted as either reliable or relevant to diagnosis of sick building syndrome.

(3) whether a sufficient factual basis exists to support the expert testimony."

A trial judge has wide latitude in determining whether expert testimony is sufficiently reliable to be admitted into evidence, and his sound discretion will not be disturbed on appeal unless the decision to admit the expert testimony was clearly erroneous or constituted an abuse of discretion. *See Wilson v. State,* 370 Md. 191, 200, 803 A.2d 1034, 1039 (2002); *Massie v. State,* 349 Md. 834, 850–51, 709 A.2d 1316, 1324 (1998).

 Maryland adheres to the standard set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), for determining the admissibility of scientific evidence and expert scientific testimony. *Reed,* 283 Md. at 389, 391 A.2d at 372 (adopting the *Frye* standard). Under the *Frye–Reed* test, a party must establish first that any novel scientific method is reliable and accepted generally in the scientific community before the court will admit expert testimony based upon the application of the questioned scientific technique. *Wilson,* 370 Md. at 201, 803 A.2d at 1039. A trial court may take judicial notice of the reliability of scientific techniques and methodologies that are widely accepted within the scientific community. *Reed,* 283 Md. at 380, 391 A.2d at 367. A trial court also may take notice that certain scientific theories are viewed as unreliable, bogus, or experimental. *Id.* However, when it is unclear whether the scientific community accepts the validity of a novel scientific theory or methodology, we have noted that before testimony based on the questioned technique may be admitted into evidence, the reliability must be demonstrated. *Wilson,* 370 Md. at 201, 803 A.2d at 1039–40. While the most common practice will include witness testimony, a court may take judicial notice of journal articles from reliable sources and other publications which may shed light on the degree of acceptance *vel non* by recognized experts of a particular process or view. *Reed,* 283 Md. at 380, 391 A.2d at 367. The opinion of an "expert" witness should be admitted only if the court finds that "the basis of the opinion is generally accepted as reliable within the expert's particular scientific field." *Wilson,* 370 Md. at 201, 803 A.2d at 1040.

■ Where evidence is subject to challenge under *Frye–Reed*, it is the better practice for a court to address the issue pre-trial and out of the presence of the jury. *Clemons v. State*, 392 Md. 339, 347–48 n. 6, 896 A.2d 1059, 1064 n. 6 (2006). *Frye–Reed* hearings are best held before trial in order to preclude jury members from considering irrelevant evidence and to ensure that the verdict is derived from evidence which is before the jury properly. *Id.* at 348 n. 6, 896 A.2d at 1064 n. 6. As we noted in *Reed*, "*Frye* was deliberately intended to interpose a substantial obstacle to the unrestrained admission of evidence based upon new scientific principles." *Reed*, 283 Md. at 386, 391 A.2d at 370 (quoting *People v. Kelly*, 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240, 1245 (1976)). In addition, *Frye–Reed* generally involves matters collateral to the substantive issues at trial, and for that reason alone is better resolved outside of the presence of the jury. *Clemons*, 392 Md. at 348 n. 6, 896 A.2d at 1064 n. 6.

■ In the case *sub judice*, the Court of Special Appeals held that it was unnecessary for the Circuit Court to hold a *Frye–Reed* hearing, reasoning (1) that Dr. Shoemaker's medical diagnosis was not a proper subject for *Frye–Reed* analysis, and (2) that the tests Dr. Shoemaker used in reaching his medical diagnoses are generally accepted in the medical community, and are therefore not subject to *Frye–Reed* analysis. *Montgomery Mutual*, 170 Md.App. at 560, 907 A.2d at 878. We disagree and hold that, based on this record, the Circuit Court should have held a *Frye–Reed* hearing to determine whether the medical community generally accepts the theory that mold exposure causes the illnesses that respondents claimed to have suffered, and the propriety of the tests Dr. Shoemaker employed to reach his medical conclusions.

■ This Court has emphasized repeatedly that *Frye–Reed* is meant to apply to evidence based on scientific opinion. *See Clemons*, 392 Md. at 364, 896 A.2d at 1073; *Wilson*, 370 Md. at 201, 803 A.2d at 1040; *Reed*, 283 Md. at 381, 391 A.2d at 368. The proper test for determining admissibility under *Frye–Reed* "is whether the basis of the opinion is generally accepted as reliable within the expert's particular scientific

field." *Wilson,* 370 Md. at 201, 803 A.2d at 1040. Dr. Shoemaker's testimony was based on scientific opinion regarding the causal link between mold exposure and sick building syndrome. As such, both his theories regarding causation and the tests he employed to diagnose respondents were subject to *Frye–Reed* analysis.

Our decision in *Wilson* helps to demonstrate this point. In *Wilson,* we found that the trial court erred in permitting the State to use statistical data and a product rule computation to prove the improbability of two Sudden Infant Death Syndrome deaths in a single family. *Id.* at 195, 803 A.2d at 1036. While admitting that Frye–Reed "often will not apply to statistical calculations because the choice between alternative statistical techniques, although subjective, is often merely a choice between equally valid methods of describing the same underlying scientific data," *id.* at 202, 803 A.2d at 1040 (quoting *Armstead v. State,* 342 Md. 38, 80 n. 33, 673 A.2d 221, 242 n. 33 (1996)), we noted that there are instances where the use of generally accepted statistical techniques will nonetheless be subject to *Frye–Reed* analysis. *Wilson,* 370 Md. at 203, 803 A.2d at 1041. We used the following example to explain:

> "[S]uppose that a new species of flower is discovered. When it is discovered, a white-flowered variety and a red-flowered variety are observed. It would be incorrect to calculate the probability of a new plant having white flowers based on a normal distribution, because this would depend on whether flower colors varied along a continuum from white to pink to red, or whether there were only discrete possibilities for the flower color, *i.e.,* white or red. Under this scenario, the correct choice of probability calculations would depend on the underlying genetics of the plant."

*Wilson,* 370 Md. at 203, 803 A.2d at 1041 (quoting *Armstead,* 342 Md. at 80 n. 33, 673 A.2d at 242 n. 33) (internal citations omitted). We held that in cases in which the proper choice of statistical techniques was dependent on an underlying scientific phenomenon or principle, a court must engage in *Frye–Reed* analysis to determine whether that phenomenon or principle is generally accepted in the scientific community and

whether the proper scientific tests were used to reach the expert's conclusions. *Wilson,* 370 Md. at 203, 803 A.2d at 1041.

In the instant case, the expert witness offered a medical opinion that was based on an underlying scientific principle. The question before the Circuit Court was whether Dr. Shoemaker's theory regarding mold exposure and illness, and the techniques he employed to reach his medical conclusions, were generally accepted in the medical community. Petitioner's request for an evidentiary hearing was not a frivolous motion.

Courts across the United States have applied either the *Frye* test or the test set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) to determine the admissibility of expert medical testimony that mold exposure causes illness. *See e.g., Roche v. Lincoln Property Co.,* 278 F.Supp.2d 744 (E.D.Va. 2003) (applying the *Daubert* test to determine the admissibility of a physician's testimony that mold exposure caused various ailments); *Flores v. Allstate Texas Lloyd's Company,* 229 F.Supp.2d 697 (S.D.Tex.2002) (applying the *Daubert* test to a medical expert's testimony regarding mold exposure and illness); *Mondelli v. Kendel Homes Corp.,* 262 Neb. 263, 631 N.W.2d 846 (2001) (applying the *Frye* test to determine the admissibility of medical expert testimony regarding mold exposure and respiratory illness); *Geffcken v. D'Andrea,* 137 Cal.App.4th 1298, 41 Cal.Rptr.3d 80 (2006) (applying California's *Kelly–Frye* test, derived from *People v. Kelly,* 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240, to testimony regarding the relationship between mold exposure and sick building syndrome); *Allison v. Fire Ins. Exchange,* 98 S.W.3d 227 (Tex.App.2002) (applying Texas' *Robinson–Daubert* test to address a medical expert's theory that mold exposure led to adverse health effects); *Centex–Rooney Const. v. Martin County,* 706 So.2d 20 (Fla.App.1997) (applying the *Frye* standard to expert opinion evidence regarding the link between exposure to toxic mold and certain adverse health effects). *See also* DANIEL J. PENOFSKY, *Litigating Toxic* Mold Cases, in 92 AM JUR. TRIALS 113 at § 87, p. 325 (2004, 2006 Cum.Supp.)

(noting that "admissibility of expert medical or scientific testimony on the trial of the toxic mold case on such key issues as exposure to toxic mold and causation of illness ... will typically be resolved pursuant to an in limine hearing conducted prior to trial or during trial but out of hearing by the jury"); KATHLEEN L. DAERR-BANNON, *Cause of Action by Residential Owners and Tenants for Personal Injury and Property Damage Due to Toxic Mold, in* 26 CAUSES OF ACTION 2d 529 at § 20, p. 562 (2006, 2007 Cum.Supp.) (noting that in "toxic mold cases, the court is likely to serve as gatekeeper and make a threshold determination on admissibility of scientific or medical testimony. Courts will usually schedule a separate hearing before or during trial as to whether the requisite standard for such testimony has been met, often referred to as a *Daubert* or *Frye* hearing."). As have the courts that have considered this issue, we think it clear that expert medical testimony, such as that offered by Dr. Shoemaker, is the proper subject of a *Frye–Reed* hearing.

The Court of Special Appeals relied upon *CSX v. Miller*, 159 Md.App. 123, 858 A.2d 1025, and *Myers v. Celotex Corp.*, 88 Md.App. 442, 594 A.2d 1248, to support the conclusion that Dr. Shoemaker's medical opinion testimony was not subject to analysis under *Frye–Reed*. In both of those cases, the Court of Special Appeals held that a *Frye–Reed* hearing was unnecessary to admit a medical expert's opinion regarding the origin of a patient's illness. *See CSX*, 159 Md.App. at 187, 858 A.2d at 1062; *Myers*, 88 Md.App. at 458–59, 594 A.2d at 1256–57. *Myers* involved a medical expert's testimony that exposure to asbestos caused cancer. Similarly, *CSX* involved a medical opinion regarding the etiology of a patient's arthritis. In both cases, the intermediate appellate court found that *Frye–Reed* analysis was unnecessary because *"Reed v. State has not been extended to medical opinion evidence* which is not 'presented as a scientific test the results of which were controlled by inexorable, physical laws.' "[6] *CSX*, 159 Md.App.

---

**6.** In *Myers v. Celotex Corp.*, 88 Md.App. 442, 594 A.2d 1248 (1991), the Court of Special Appeals cited our opinion in *State v. Allewalt*, 308 Md.

at 188, 858 A.2d at 1063 (quoting *Myers,* 88 Md.App. at 458–59, 594 A.2d at 1256–57) (emphasis in original).

The instant case differs from both *CSX* and *Myers.* It involves more than a generally accepted medical opinion and diagnosis. Dr. Shoemaker employs medical tests to reach a conclusion that is not so widely accepted as to be subject to judicial notice of reliability.[7] Further, as we noted in *Reed,*

---

89, 517 A.2d 741 (1986), to support its position that *Frye–Reed* has not been extended to medical opinion evidence. *Myers,* 88 Md.App. at 458–59, 594 A.2d at 1256–57. *Allewalt* differs from the present case significantly. In *Allewalt,* we noted specifically that the medical expert's opinion was accepted in the relevant medical community. *Allewalt,* 308 Md. at 99, 517 A.2d at 746 (stating that there "is no issue in this case over the fact that psychiatrists and psychologists recognize PTSD [post-traumatic stress disorder] as an anxiety disorder"). The primary issue in the case *sub judice* is whether the medical expert's opinion has been generally accepted in the relevant medical community.

7. While we offer no opinion on the general acceptance of Dr. Shoemaker's medical conclusions, we think it clear that his theories are not the proper subject of judicial notice. The debate on toxic mold and sick building syndrome has become increasingly prevalent in American courtrooms, and courts across the country have reached differing conclusions regarding the causal relationship between mold exposure and sick building syndrome. *See e.g., Mondelli v. Kendel Homes Corporation,* 262 Neb. 263, 631 N.W.2d 846, 858 (2001) (holding that under the *Frye* standard, expert testimony was permissible on the subject of mold exposure and respiratory illness); *Geffcken v. D'Andrea,* 137 Cal.App.4th 1298, 41 Cal.Rptr.3d 80, 89 (2006) (finding that under California's *Kelly–Frye* standard, expert testimony was inadmissible because appellants failed to show that the relationship between mold exposure and sick building syndrome has gained general acceptance in the relevant scientific community); *Centex–Rooney Const. v. Martin County,* 706 So.2d 20, 26 (Fla.App.1997) (finding that under the *Frye* standard, the scientific community recognizes the link between exposure to toxic mold and certain adverse health effects).

The General Assembly has taken notice of the increasing claims linked to toxic mold exposure, and during the 2001 Session, established a task force on indoor air quality to address the subject. *See* S.B. 283 (2001). The task force issued a lengthy report on indoor air quality, reaching the following conclusions:

"Some molds have also been shown to produce toxins (termed mycotoxins) which have been shown to have significant health effects in animals when given in high doses. While *there is considerable scientific debate about the potential for these molds to cause toxic effects in people in concentrations typically seen in office buildings,*

novel medical theories regarding the causes of medical conditions have been subject to *Frye* analysis. *Reed,* 283 Md. at 383, 391 A.2d at 369 (noting that the *Frye* test has been applied to "medical testimony regarding the cause of birth defects"). *See also Aventis Pasteur, Inc. v. Skevofilax,* 396 Md. 405, 431 n. 18, 914 A.2d 113, 128–29 n. 18 (2007) (noting that an expert's medical opinion will not be admissible unless it is generally accepted as reliable in the expert's particular field).

The Circuit Court erred when it allowed Dr. Shoemaker's testimony without first holding a *Frye–Reed* hearing to determine whether his theories and methodologies are generally accepted in the medical community.

## IV.

 The question arises as to the proper remedy for the trial court's error and whether the judgment should be vacated and a new trial ordered, or whether this matter is better suited to a limited remand pursuant to Maryland Rule 8–

---

there is consensus among the Task Force and most health professionals that:

(1) *Mold growth in buildings can have adverse health consequences;*

(2) Normal background levels of mold can be found in all buildings;

(3) *There is an inadequate base of scientific knowledge at this time to set health-based mold standards for buildings because of uncertainties about levels of exposures, the relationship between exposure and different health effects, and differences in susceptibility from person to person;*

(4) While background levels of mold and mold exposures in buildings cannot be completely eliminated, exposures due to indoor mold contamination can and should be minimized; and

(5) Mold growth and contamination in office buildings can and should be prevented or controlled through the use of adequate and ongoing maintenance of the building and building systems, as well as through good housekeeping."

Maryland State Task Force on Indoor Air Quality, *Final Report,* p. 11 (2002), *available at* http://www.dllr.state.md.us/labor/indoorairfinal/iaqfinalreport.pdf (emphasis added). Both the findings of the task force and our analysis of cases across the country lead us to believe that Dr. Shoemaker's theories should be subject to a *Frye–Reed* hearing and not taken as reliable through judicial notice.

604(d), with directions to the trial court to hold a *Frye–Reed* hearing. This case fits well within the Maryland rule permitting and providing for a limited remand.

Maryland Rule 8–604(d) provides, in pertinent part, as follows:

> "(d) **Remand.** (1) Generally. If the Court concludes that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment, or that justice will be served by permitting further proceedings, the Court may remand the case to a lower court. In the order remanding a case, the appellate court shall state the purpose for the remand. The order of remand and the opinion upon which the order is based are conclusive as to the points decided. Upon remand, the lower court shall conduct any further proceedings necessary to determine the action in accordance with the opinion and order of the appellate court."

A limited remand is appropriate in various circumstances, in both civil and criminal cases, and most notably "when the purposes of justice will be advanced by permitting further proceedings." *Southern v. State,* 371 Md. 93, 104, 807 A.2d 13, 19–20 (2002). A remand may be limited if the error occurred in a proceeding collateral to the trial itself, and the limited purpose of the remand is to correct the error that occurred during the collateral proceeding. *Lipinski v. State,* 333 Md. 582, 591, 636 A.2d 994, 998 (1994).

Our jurisprudence is replete with examples where a limited remand is proper. *See e.g., Edmonds v. State,* 372 Md. 314, 812 A.2d 1034 (2002) (ordering a limited remand to hold a new Batson hearing to address the credibility of prosecutor's race-neutral explanations for the use of peremptory strikes); *In re Adoption/Guardianship No. A91–71A,* 334 Md. 538, 640 A.2d 1085 (1994) (ordering a limited remand to appoint independent counsel to represent the interests of a child involved in a contested adoption proceeding); *Patrick v. State,* 329 Md. 24, 617 A.2d 215 (1992) (ordering a limited remand to determine whether a criminal defendant was prejudiced by the State's

failure to disclose polygraph test results); *Scheve v. Shudder,* 328 Md. 363, 614 A.2d 582 (1992) (ordering a limited remand so that the trial court could determine whether to dismiss an action pursuant to Maryland Rule 2–506); *Warrick v. State,* 326 Md. 696, 607 A.2d 24 (1992) (ordering a limited remand to hold an *in camera* hearing to determine whether the defendant was entitled to the name of a confidential State informant, and if so, whether he suffered prejudice due to the State's failure to provide the name of that informant); *Reid v. State,* 305 Md. 9, 501 A.2d 436 (1985) (ordering a limited remand to hold an evidentiary hearing regarding the authenticity of character letters offered by defendant during sentencing proceedings); *Bailey v. State,* 303 Md. 650, 496 A.2d 665 (1985) (ordering a limited remand to permit the State to provide discovery material regarding statements made by the defendant to an out-of-state police trooper and to allow the trial court to determine the appropriate sanction for the discovery violation); *Wiener v. State,* 290 Md. 425, 430 A.2d 588 (1981) (ordering a limited remand to reconsider defendant's motion for dismissal of his indictment due to ineffective assistance of counsel).

Other appellate courts addressing *Frye* or *Daubert* issues have ordered limited remands. For example, in *Brim v. State,* 695 So.2d 268 (Fla.1997), the Florida Supreme Court ordered a limited remand after determining that DNA population frequency tests were subject to analysis under the *Frye* test. The court noted that there would be no need to overturn the verdict if the trial court found that the methods satisfied the *Frye* test; a new trial would be necessary only if the trial court reached a contrary conclusion and found the tests should have been inadmissible. *Id.* at 275. Likewise, in *People v. Leahy,* 8 Cal.4th 587, 34 Cal.Rptr.2d 663, 882 P.2d 321 (1994), the California Supreme Court ordered a limited remand to hold a *Kelly–Frye* hearing. In addressing the propriety of certain field sobriety tests, California's highest court noted that retrial of the case might be unnecessary because the questioned scientific evidence could be found admissible at the hearing. *Id.* 34 Cal.Rptr.2d 663, 882 P.2d at 335. *See also*

*State v. Harvey,* 151 N.J. 117, 699 A.2d 596, 683 (1997) (recognizing that an appellate court addressing a *Daubert* issue may "remand the matter to the trial court to take additional testimony about the general acceptance of the scientific evidence").

 In this case, the issue to be resolved, *i.e.,* the threshold question of the admissibility of Dr. Shoemaker's testimony, is collateral to the issues to be resolved at trial. *See Clemons,* 392 Md. at 348 n. 6, 896 A.2d at 1064 n. 6 (noting that *Frye–Reed* hearings generally involve matters collateral to the substantive issues of a case). Verdicts should not be vacated unnecessarily, and in this case, a retrial may not be necessary. Indeed, it would be a grave injustice were we to reverse the judgment and vacate the verdict, and then the trial court, after a *Frye–Reed* hearing, determined properly that Dr. Shoemaker's testimony was generally accepted within the scientific community. Accordingly, we remand this case for an evidentiary hearing to ascertain whether Dr. Shoemaker's methodologies used for diagnosis and theories regarding the causal connection between mold exposure and certain human health effects are generally accepted in the scientific community. The trial court is directed to make factual findings and conclusions and then to issue a *Frye–Reed* determination. If the trial court finds that Dr. Shoemaker's methods and theories satisfy the Frye–Reed test, the judgment should remain in effect. If the court finds to the contrary, the judgment should be vacated. Our remand is limited solely to this issue.

***JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND CASE, WITHOUT AFFIRMANCE OR REVERSAL, TO THE CIRCUIT COURT FOR HOWARD COUNTY FOR THE PURPOSE OF HOLDING A HEARING PURSUANT TO THE MOTION IN LIMINE. THE JUDGMENTS OF THE CIRCUIT COURT REMAIN IN EFFECT UNLESS VACATED BY THE CIRCUIT COURT IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE FOREGOING OPINION. COSTS IN***

*THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.*