**[J-58-2016][M.O. – Wecht, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

COMMONWEALTH OF PENNSYLVANIA,    :    No. 709 CAP
         :
         Appellee    :    Appeal from the Judgment of Sentence
         :    imposed on 10/9/14 in the Court of
         v.    :    Common Pleas, York County, Criminal
         :    Division at No. CP-67-CR-0006857
         :
TIMOTHY MATTHEW JACOBY,    :
         :
         Appellant    :    SUBMITTED:  May 10, 2016


## DISSENTING OPINION


**CHIEF JUSTICE SAYLOR**                    **DECIDED:  September 28, 2017**

I join the majority's treatment of all the issues except for part V, pertaining to the search warrant for Appellant's home seeking a handgun registered in his name, and part VIII, regarding the rejection of Appellant's claim for a *Frye* hearing premised on challenging the reliability of the statistical analysis pertaining to Y-STR DNA testing.[1]

As to the search warrant for Appellant's home, my view comports with the reasoning of Justice Mundy, namely, that the probable cause affidavit sufficed to support the inference that Appellant's firearm would be found in his residence. *See* Concurring Opinion, *slip op.* at 2-4. To that analysis I would add that the import of the majority's emphasis on the proximity between the crime scene and Appellant's home is not clear, and there is no cited authority for the notion that such a consideration is

---

[1] *See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

determinative in reviewing a probable cause assessment. *See, e.g.*, Majority Opinion, *slip op.* at 25-26.[2]

Further, even assuming that the majority's substantive analysis is correct, I have difficulty with its application of the harmless error standard.[3] The applicable analysis requires the Commonwealth to establish beyond a reasonable doubt that the relevant trial court error did not affect the verdict. *See Commonwealth v. Mitchell*, 576 Pa. 258, 280, 839 A.2d 202, 214 (2003) (citing *Commonwealth v. Story*, 476 Pa. 391, 408, 383 A.2d 155, 164 (1978)). Additionally, reviewing courts are to confine their appraisal to the "properly admitted and *uncontradicted evidence* of guilt." *Commonwealth v. Wright*, 599 Pa. 270, 312, 961 A.2d 119, 143 (2008) (emphasis added) (quoting *Commonwealth v. Young*, 561 Pa. 34, 85, 748 A.2d 166, 193 (1999) (*on reargument*)). Along these lines, this Court has explained:

> Where the evidence is disputed, it is necessary that the factfinder weigh the opposing sides' evidence, making credibility determinations where necessary. A jury which had been exposed to tainted evidence would have utilized that tainted evidence in performing this weighing process, thus making its ultimate determination suspect. Furthermore, we as an appellate court cannot attempt to rectify this error by disregarding the tainted evidence and reweighing the properly admitted evidence of the Commonwealth against that presented by the defendant. Where such factfinding functions are implicated, appellate

---

[2] Of course, proximity could play a role, if, for example, the suspect was apprehended immediately following the commission of the crime, and the home was located such a distance away as to make travel there impossible within the subject timeframe. However, such facts are not presently before the Court.

[3] Notably, the Commonwealth does not presently advance any claim of harmless error, for which it bears the burden of proof. *See Commonwealth v. Mitchell*, 576 Pa. 258, 280, 839 A.2d 202, 215 (2003) (citation omitted).

courts are incompetent to choose which side's evidence is more persuasive.

*Young*, 561 Pa. at 86, 748 A.2d at 194 (internal citation omitted).

Presently, in tension with the above, the majority evaluates only the Commonwealth's evidence in support of its conclusion that the evidence of Appellant's guilt is comparatively overwhelming. Indeed, from my point of view, its analysis more closely resembles review for sufficiency of the evidence, in which the facts are taken most favorably to the Commonwealth, than harmless-error review, where the entire record is to be considered, including that which is favorable to the defendant. Notably, such deviations from strict harmless-error review have been the subject of significant critical commentary. *See* Harry T. Edwards, *To Err Is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?*, 70 N.Y.U. L. REV. 1167 (1995) (discussing, at length, the difficulties facing appellate judges in adhering to an effect-on-the-verdict framework for harmless error review in cases in which the defendant's guilt seems well established, and the substantial consequences of failing to do so, particularly in terms of the erosion of constitutional rights); Jeffrey O. Cooper, *Searching for Harmlessness: Method and Madness in the Supreme Court's Harmless Constitutional Error Doctrine*, 50 U. KAN. L. REV. 309, 340, 344 (2002) (discussing the rigorous analysis essential to harmless error review and questioning conclusory decision making that is "essentially opaque because it tends to [affirm on the basis of harmless error] in the most summary fashion, with little or no analysis").

In this regard, I note that Appellant substantively contested most aspects of the Commonwealth's case, including the timeline of the murder, the witness identifications, the van seen on the surveillance video, the ballistics evidence, his knowledge of the cash payments, and the possible motive. *See* N.T., Oct. 7, 2014, at 1481-82, 1483, 1488-89, 1492-93, 1496-97, 1500-01, 1504 (summarizing, in closing, these various

deficiencies in the Commonwealth's case).[4]  Rather than addressing the many contradictions, the majority relies on inferences favorable to the Commonwealth.  For example, although Appellant's coworker identified the company's work van from the surveillance video, no one testified to having "seen" Appellant, or anyone matching his description, driving the company van that day.  *Compare* Majority Opinion, *slip op.* at 28 ("On that date, a man matching [Appellant's] description was seen driving a customized van that belonged to the company for which he worked"), *with* N.T., Oct. 2, 2014, at 910 ("Q.  Do you see the driver [in the surveillance video]?  [Coworker:] No.").

Further the majority cites to testimony by two of the victim's neighbors in which they recalled seeing a man who generally fit Appellant's description nearby the victim's residence on the day of the murder.  *See* Majority Opinion, *slip op.* at 28.  However, omitted from the majority's review is testimony from those same neighbors that the person they saw was balding with short-cut hair, *see* N.T., Sept. 30, 2014, at 476; N.T., Oct. 1, 2014 at 521 ("He had a well-groomed head [of] hair . . .."), which materially

---

[4]  In addition to Appellant's own evidence, many of his challenges to the Commonwealth's circumstantial case were developed via cross-examination of the prosecution's witnesses, seeking to undercut their credibility, highlight inconsistencies, and/or refute inferences that the Commonwealth attempted to draw, as reflected in some of the testimony recited herein.  In this respect, although closing arguments are generally not considered evidence, Appellant's closing provides a convenient synthesis of the substantive evidentiary disputes he advanced at trial.  Moreover, while there may be some divergent views regarding the precise contours of what constitutes contradicted evidence, the gravamen of that aspect of the harmless error framework is that the appellate courts should not attempt to replicate the jury's role in weighing the parties competing advocacies when assessing the comparative import of improperly admitted evidence.  *See Young*, 561 Pa. at 86, 748 A.2d at 194

conflicts with the clean-shaven appearance that Appellant possessed at the relevant time, as indicated by other testimony and evidence, *see* N.T., Oct. 6, 2014, at 1386.[5]

Additionally, as to Appellant's failure to attend the meeting on the day of the murder, although his fiancée proffered a general expectation that he would be there, she ultimately seemed to waver on that assertion.  *See* N.T., Oct. 6, 2014, at 1402-03, 1415-16.   Other testimony indicated that Appellant's attendance depended on his employment schedule, since the 2 or 3 p.m. start time of the meetings conflicted with his usual work hours.  *See id.* at 1212, 1297, 1399.

Turning, then, to the second-generation Kel-Tec barrel recovered from Appellant's home, to the degree that its admission was in error, I believe it was not harmless, since the Commonwealth characterized that evidence as a significant component of the ballistics evidence, upon which it placed great emphasis.  *See* N.T., Oct. 7, 2014, at 1535 ("The ballistics tell us everything."); *see id.* at 1564 ("Gun, DNA, guilty.").   The Commonwealth highlighted in closing that Appellant purchased the second-generation barrel following the murder and allegedly modified it in an attempt to make it compatible with his registered firearm.  The prosecution suggested that these actions reflected a consciousness of guilt and emphasized that these facts were important parts of the "game of connect the dots" drawn from the circumstantial evidence.  *Id.* at 1528; *see also id.* at 1538 ("All of that [gun related] evidence connects, all of it fits . . ..").  Thus, it is difficult, in properly evaluating only the uncontroverted evidence, to divorce the second-generation gun barrel discovered in Appellant's home

---

[5] Further complicating this analysis is the fact that Appellant's counsel used his own hair length as a reference point for one of the neighbor's description of the person's hair. *See* N.T., Oct. 1, 2014, at 533.  The lack of a contemporaneous record as to counsel's hair length highlights the problem in attempting to resolve, on appeal, conflicting evidence for purposes of a harmless error analysis.

from the jury's potential assessment of guilt, and I would conclude that the admission of that evidence could not be viewed as harmless.

Regarding Appellant's *Frye* hearing request, the majority correctly observes that Appellant conceded the general reliability of discrete aspects of the Y-STR testing regime, including the laboratory processes for acquiring and comparing samples, the manner in which the database samples are collected, and the "counting" method for interpreting Y-STR results. Brief for Appellant at 40-41 (discussing these accepted practices). I also agree with the view that Appellant's claim relative to Y-STR's discriminatory weakness -- namely, its inability to statistically discern a DNA contributor from all other persons, as can be done with autosomal DNA testing -- largely implicates the weight of the evidence and is for the jury to assess. *See* Majority Opinion, *slip op.* at 43 & n.14.[6]

---

[6] Some courts have expressed concerns that omitting a statistical analysis of DNA testing may mislead the jury or render the evidence inadmissible on relevancy grounds. *See Commonwealth v. Mattei*, 920 N.E.2d 845, 856 (Mass. 2010) ("If the jury are not provided with similar statistical evidence where the DNA test result is a 'nonexclusion,' there is a real risk that jurors will be misled into thinking that these DNA test results are similarly significant and that the nonexclusion evidence is similarly conclusive as to the 'matched' contributor's identity, when in fact the actual meaning of such results can vary substantially."); *Deloney v. State*, 938 N.E.2d 724, 730 (Ind. Ct. App. 2010) ("Therefore DNA evidence that does not constitute a match or is not accompanied by statistical data regarding the probability of a defendant's contribution to a mixed sample is not relevant . . . and should not be admitted." (citation omitted)); *State v. Tester*, 968 A.2d 895, 907 (Vt. 2009) ("To say that two patterns match, without providing any scientifically valid estimate (or, at least, an upper bound) of the frequency with which such matches might occur by chance, is meaningless.") (quoting National Research Council, DNA Technology in Forensic Science 74 (Nat'l Academies Press 1992)). Here, the Commonwealth's expert concluded that Appellant, "his paternally male relatives and an unknown number of males in the general population" could not be excluded as contributors to the sample taken from the victim's fingernail. N.T., Sept. 30, 2014, at 408. She further testified that, statistically, the probability of finding Appellant's Y-STR profile at random is one out of every 1,724 Caucasian males. *See id.* at 445-46.

However, as the majority acknowledges, Appellant raised challenges to other aspects of the Y-STR DNA methodologies that suggest the need for a *Frye* hearing. *See id.*, *slip op.* at 44 n.15.[7]  Specifically, Appellant contested the reliability of the

---

[7] Relative to these other challenged aspects, the majority appears to limit its review of Appellant's *Frye*-based contentions to only those that were well developed at oral argument, effectively concluding that all other grounds for relief raised in his Omnibus Pretrial Motions and supporting brief were waived.  *See* Majority Opinion, *slip op.* at 44 n.16 (explaining that "[w]e hold only that [Appellant's] proffer *at the hearing* was insufficient to demonstrate novelty" (emphasis added)); *see also id.* at 43 (characterizing the hearing as "his opportunity to demonstrate the necessity for a *Frye* hearing").  Although the majority disclaims any finding of waiver, *see id.* at 43 n.14, it later concedes that Appellant forwarded preserved, on-the-record claims pertaining to the DNA evidence that are not addressed in the majority opinion.  *See id.* at 44 n.16 ("There may be challenges to other aspects of the Y-STR DNA methodologies. [Appellant] identified some of those issues in his original pre-trial motion as well as in his brief to this court.").  Thus, I believe that the majority's narrowing approach contravenes established precepts pertaining to issue preservation and waiver and overlooks one of Appellant's primary grounds supporting a *Frye* hearing.

As to the latter, although conceding that the Y-STR databases were not novel in their creation, Appellant challenged the methodology of applying them during the hearing. *See* N.T., Jan. 2, 2014, at 46 ("[I]t's a different methodology in the way that you are actually analyzing the data.").  In this respect, it seems that the trial court may not have fully grasped this distinction, as it expressed confusion and continually returned to the notion of how the database is "put together, is created."  *Id.* at 44, 46 ("THE COURT: . . . I'm not a scientist.  I could be wrong about [how the databases are created.]  What I hear you saying is -- I don't know what I hear you saying, to be frank with you."); *see also* Majority Opinion, *slip op.* at 43 (observing that the trial court repeatedly questioned Appellant regarding the manner in which the Y-STR database was created).

Additionally the majority's narrow review appears to be in substantial tension with the Court's precedent, which holds that all grounds for relief presented in a pretrial motion are preserved for appellate review. *See Commonwealth v. Mitchell*, 464 Pa. 117, 123, 346 A.2d 48, 51 (1975).  Further, Rule 575 of Criminal Procedure mandates waiver only when an issue is not raised in a pretrial motion. *See* Pa.R.Crim.P. 575(A)(3); *see also* Pa.R.Crim.P. 578 (requiring pretrial requests for relief to be included in one omnibus motion).  Accordingly, it is inapposite to limit review to only those aspects of the omnibus motion that were explicitly raised at the hearing, particularly as, in this matter, the trial judge repeatedly directed queries to the creation of the databases, rather than (continued…)

statistical conclusions derived from the Y-STR DNA testing.  *See* Brief for Appellant at 47.[8]

In requesting a *Frye* hearing, Appellant argued that the relevant literature suggests that the Y-STR database is too small to arrive at an accurate, scientifically reliable statistical probability; that rare Y-STR profiles may not be sufficiently represented; and that local databases should be employed to account for profile frequency differences based on locale, concerns that are not present with the autosomal DNA database.  *See* Defendant's Omnibus Pretrial Motions at ¶¶60-61 (citing Lutz Roewer, *Y Chromosome STR Typing in Crime Casework*, FORENSIC SCI., MED., & PATHOLOGY, June 2009, at 77-84); Defendant's Brief in Support of Defendant's Omnibus Pretrial Motions at 25 (citing WISCONSIN STATE PUBLIC DEFENDERS, TRYING STR CASES 3 (undated); JOHN BUCKLETON, CHRISTOPHER M. TRIGGS & SIMON J. WALSH, FORENSIC DNA EVIDENCE INTERPRETATION 324 (2004)).  He also emphasized the differences in test kits, databases, and the nature of the results between autosomal DNA testing and Y-STR testing.  These issues, he contended, lead to "legitimate concerns by experts in the field concerning the reliability of the conclusions from Y-STR

---

(…continued)
other pertinent aspects of Appellant's presentation.  *See, e.g.*, Majority Opinion, *slip op.* at 43 ("Repeatedly, [Appellant] was forced by the trial court's questioning to concede that the Y-STR databases were not created in a novel fashion that would differentiate the scientific methods of creating these databases from others.").

[8] I also have difficulty with the majority's statement that Appellant did not challenge the "statistical conclusions stemming from the use of the counting method."  Majority Opinion, *slip op.* at 38.  In this regard, Appellant consistently contested the reliability of the statistical results in his pretrial motions, supporting brief, and in oral argument to the trial court, although his claims were not expressly premised on the general use of the counting method.  *See* Defendant's Omnibus Pretrial Motions at ¶¶60-62; Defendant's Brief in Support of Defendant's Omnibus Pretrial Motions at 25-27; N.T., Jan. 2, 2014, at 42-43, 45, 47-48.

DNA testing in the area of forensic science." Defendant's Brief in Support of Defendant's Omnibus Pretrial Motions at 27.

The Court has emphasized that the term "novel" is to be ascribed a "reasonably broad meaning." *Betz v. Pneumo Abex, LLC*, 615 Pa. 504, 545, 44 A.3d 27, 53 (2012); *see also Commonwealth v. Walker*, 625 Pa. 450, 489, 92 A.3d 766, 790 (2014) (citing *Grady v. Frito-Lay, Inc.*, 576 Pa. 546, 557, 839 A.2d 1038, 1045 (2003), for the precept that "*Frye* is applicable to novel science, as well as where scientific methods are utilized in novel way"). In this respect, Appellant's claim regarding the reliability of the Y-STR statistical analysis echoes prior reservations the Court has expressed regarding emerging DNA forensic evidence.

> Suffice to say that the scientific processes carried out in a laboratory to compare DNA samples are now routine and fully accepted in the scientific community . . .. *What has not yet achieved universal agreement is the less objective selection of the appropriate population for statistical purposes and the actual statistical analysis which is to be applied to the physical analysis carried out in the laboratory.* About the statistical treatment of the physical evidence there remains disagreement and continuing theoretical development. . . . What is not universally agreed is what conclusions can validly be drawn from the matches observed in the samples.

*Commonwealth v. Crews*, 536 Pa. 508, 520, 640 A.2d 395, 400-01 (1994) (emphasis added).[9] This Court has traditionally viewed statistical probabilities premised on DNA analysis as an inquiry separate from the processes related to DNA sampling. *See, e.g.*, *id*. at 520, 640 A.2d at 400-01; *Blasioli*, 552 Pa. at 151, 713 A.2d at 1118.

Moreover, commentators observe that some courts have improperly extended the acceptance of prior DNA testing in admitting emerging sampling methodologies

---

[9] Ultimately, the Court largely resolved questions pertaining to the statistical analysis of autosomal DNA testing in *Commonwealth v. Blasioli*, 552 Pa. 149, 713 A.2d 1117 (1998).

without a pretrial hearing, specifically highlighting Y-STR interpretation as an area of concern. *See* David H. Kaye, David E. Bernstein & Jennifer L. Mnookin, The New Wigmore: A Treatise on Evidence: Expert Evidence §9.5.1 (2nd ed. 2017 Cumulative Supp.) ("Courts accepting Y-STR DNA testing as admissible sometimes seem to suggest that the result follows immediately from the fact that tests of other STR loci are admissible. . . . But the interpretation of Y-STRs requires an understanding of the different pattern of inheritance of these alleles and data on their frequencies. These matters generally must pass through the *Frye* or *Daubert* gate." (footnotes omitted)); David L. Faigman et al., 4 Modern Scientific Evidence §30:30 (2016-17 ed.) ("[I]t is a mistake to suggest, as have several courts, that Y-STR testing results should be admitted simply because a court has previously admitted STR results." (footnote omitted)); *see also State v. Roman Nose*, 649 N.W.2d 815, 822 (Minn. 2002) ("That the RFLP method of testing DNA has gained general acceptance does not permit evidence obtained from significantly different methods of DNA testing[, here, PCR-STR testing,] to be admitted without holding a hearing on [general acceptance]." (alterations added)). There seems to be some potential that such an error played a role in the trial court's rejection of Appellant's claims in the present matter, given the narrow fixation on comparing the manner in which autosomal and Y-STR DNA database sampling is performed. *See, e.g.*, Majority Opinion, *slip op.* at 43 (observing that the trial court repeatedly inquired about the novelty of creating the Y-STR database as compared to other DNA databases).

Although the Commonwealth contends that *Commonwealth v. Chmiel*, 612 Pa. 333, 30 A.3d 1111 (2011), approving of the admission of mitochondrial DNA testing (the female counterpart to Y-STR testing), should control here, that matter did not involve any statistical analysis. The opinions from other jurisdictions cited by the

Commonwealth in support of Y-STR testing, *see* Brief for Appellee at 41-43 (collecting cases), do not address Appellant's concerns with the limits of the database. *See also* KAYE, THE NEW WIGMORE §9.5.1 (cautioning against reliance on other courts' decisions, since, "[e]specially in the early days of a scientific technique, imbalanced hearings are not uncommon[,]" and observing that "a history of usage -- especially without any hearings on the necessary foundational research and with no meaningful appellate review of the trial rulings -- is a weak indicator of scientific acceptance").

Accordingly, I believe Appellant advanced a novel issue regarding the reliability of the statistical analysis employed in Y-STR testing and that the trial court erred in refusing a *Frye* hearing on the matter. *Accord State v. Harris*, 2009 WL 1683988, at *9 (Minn. Ct. App. June 16, 2009) (unpublished) ("The Y–STR testing method, however, has not been considered by the supreme court, and thus the district court must hold an evidentiary hearing to determine whether experts in the field share the expert's view that Y–STR testing is generally accepted or scientifically reliable.").

Additionally, I am of the view that, if admission of the Y-STR evidence was improper, that error could not be considered harmless. *See Young*, 561 Pa. at 85, 748 A.2d at 193 (recognizing that an error is harmless if (1) it did not prejudice the defendant or the prejudice was *de minimis*, (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence, or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict). Appellant substantively contested most aspects of the Commonwealth's case, as previously discussed. *See* N.T., Oct. 7, 2014, at 1483, 1488-89, 1492, 1493, 1496-97, 1500-01, 1504 (summarizing the various shortcomings of the Commonwealth's case).

Further, even acknowledging that Y-STR testing's discriminatory weakness was detailed at trial, I view the Y-STR evidence as more than minimally prejudicial, and no other similar evidence was presented. *See Commonwealth v. Topa*, 471 Pa. 223, 232, 369 A.2d 1277, 1282 (1977) ("[S]cientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen . . .." (quoting *United States v. Addison*, 498 F.2d 741, 744 (D.C. Cir. 1974)).

Although concluding that the improper admission of evidence was not harmless ordinarily requires a new trial, an error in failing to conduct a *Frye* hearing does not irreducibly mandate that proceedings begin anew, since the propriety of the admission relies on the result of that evidentiary screening in the first instance. In this respect, I would follow the approach adopted by other jurisdictions: rather than summarily subjecting the parties to a new trial in these circumstances, they have vacated the verdict and remanded for a *Frye* hearing with orders to reinstate the conviction should the challenged evidence be found admissible, or institute a new trial if the evidence was inadmissible. *See, e.g.*, *People v. Leahy*, 882 P.2d 321, 335-36 (Cal. 1994); *Brim v. State*, 695 So.2d 268, 275 (Fla. 1997); *Montgomery Mut. Ins. Co. v. Chesson*, 923 A.2d 939, 950-51 (Md. 2007).[10] As the Court of Appeals of Maryland explained, "it would be a grave injustice were we to reverse the judgment and vacate the verdict, and then the trial court, after a *Frye-Reed* hearing, determined properly that [the expert's] testimony was generally accepted within the scientific community." *Montgomery Mut. Ins. Co.*, 923 A.2d at 951 (alteration added). I am of the view that the approach endorsed by

---

[10] This procedure has been employed by the Superior Court, albeit in an unpublished opinion. *See Commonwealth v. George*, 2015 WL 5970739, at *6 (Pa. Super. Sept. 25, 2015) (unpublished) (citing *Commonwealth v. Arenella*, 306 Pa.Super. 119, 454 A.2d 243 (1982) (adopting a similar strategy with respect to independent testing of an illicit substance) (subsequent history omitted)).

these courts promotes an efficient use of limited judicial resources and reflects respect for the jury's decision without infringing upon any substantial rights of the defendant. Thus, in this case, I would vacate the conviction and remand for a *Frye* hearing with an instruction to reinstate the verdict if it is found that the Y-STR evidence was properly admitted, or to order a new trial if it was not appropriately before the jury.

Accordingly, I respectfully dissent.