DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ADDISON CONSTRUCTION CORPORATION, ADDISON
DEVELOPMENT CORPORATION,** and **DANNY E. SWANSON,**
Appellants,

v.

**LEO A. VECELLIO, JR., KATHRYN C. VECELLIO, DEAN DESANTIS,
LAURA DESANTIS, DEERFIELD BUILDERS SUPPLY COMPANY, INC.,
BLADE WINDOW AND DOOR COMPANY** a/k/a **BLADE
CONSTRUCTION, GULFSTREAM ROOFING, INC.,** and **EAGLE
WINDOW AND DOOR, LLC,**
Appellees.

No. 4D16-0618

---

**DEAN DESANTIS** and **LAURA DESANTIS,**
Appellants,

v.

**LEO A. VECELLIO, JR., KATHRYN C. VECELLIO, ADDISON
CONSTRUCTION CORPORATION,** a Florida corporation, **ADDISON
DEVELOPMENT CORPORATION,** a Florida corporation, **DANNY E.
SWANSON, DEERFIELD BUILDERS SUPPLY COMPANY, INC.,** a Florida
corporation, **R.V. ELECTRIC, INC.,** a Florida corporation, **PREFERRED
AIR CONDITIONING AND MECHANICAL, INC.,** a Florida corporation,
**L&L ORNAMENTAL ALUMINUM AND IRONWORKS, INC.,** a Florida
corporation, **PHOENIX ARCHITECTURE, INC.,** a Florida corporation,
and **ALFRED CILCIUS,**
Appellees.

No. 4D16-0863

[March 21, 2018]

Appeals and cross-appeals from the Circuit Court for the Fifteenth
Judicial Circuit, Palm Beach County; Gregory M. Keyser, Judge; L.T. Case
No. 502009CA040005XXXXMB.

Diane H. Tutt of Conroy Simberg, Hollywood, for Addison Construction Corporation, Addison Development Corporation and Danny E. Swanson.

Thomas A. Valdez and Robert J. Cousins of Quintairos, Prieto, Wood & Boyer, P.A., Tampa, and Charles E. Muller II and Brian A. Lebensburger of Muller & Lebensburger, P.A., Miami, for Dean DeSantis and Laura DeSantis.

Jack J. Aiello, G. Joseph Curley, Gregor J. Schwinghammer, Jr., and Roger Feicht of Gunster, Yoakley & Stewart, P.A., West Palm Beach, for Leo A. Vecellio, Jr. and Kathryn C. Vecellio.

DAMOORGIAN, J.

The subject of these voluminous appeals, which we have sua sponte consolidated for opinion purposes, is a sprawling ocean-front residence located in the Town of Palm Beach. According to its purchasers, Appellees/Cross-Appellants, Leo and Kathryn Vecellio ("Buyers"), the residence was defectively constructed. Based on the foregoing, Buyers sued the sellers of the home, Dean and Laura DeSantis ("Sellers"); the developer and general contractor who built the home, Addison Development Corporation and Addison Construction Corporation (individually referred to as "Addison Construction" and "Addison Development" and collectively referred to as "Addison"); Addison's principal, Danny Swanson; and a myriad of subcontractors who worked on the home. Ultimately, Buyers settled with the majority of the subcontractors and recovered over $3 million in damages from Addison, Sellers, and Mr. Swanson. Addison, Sellers, and Mr. Swanson each appeal their respective judgment(s) and Buyers cross-appeal, primarily challenging the amount of damages recovered. Collectively, the parties raise more than ten issues for our consideration on appeal. We affirm in all respects and write to discuss two discrete issues: 1) the form of the judgments and 2) the court's decision to apply certain subcontractor settlements as a setoff to Buyers' recovery for Sellers' and Addison's breach of contract.

**Background**

In 2002, Sellers purchased the subject property and then entered into Construction and Marketing Agreements with Addison regarding the construction and sale of a new custom home. Construction of the home began in 2004 and went through late 2006. After receiving a certificate of occupancy for the home, Addison Development began marketing the property on behalf of the Sellers in early 2007. A few months later, Buyers

2

placed an offer on the home thus beginning extensive negotiations between the parties. On November 27, 2007, Buyers and Sellers entered into a formal agreement ("Purchase Agreement") regarding the sale of the home. Addison joined the Purchase Agreement for the limited purpose of agreeing to provide a Warranty. Pursuant to the Purchase Agreement, Buyers had until December 17, 2007 to inspect the home and closing was set to take place on January 10, 2008.

During the inspection period, Buyers had air quality, roofing, and general inspections performed on their behalf. The air quality inspection indicated that there were elevated mold levels in portions of the home. Based on the inspection reports, Buyers created a punch-list of items they wanted repaired before going forward with the sale. The parties then entered into an Addendum to the Purchase Agreement wherein Sellers and Addison Development agreed to "repair, replace, or correct all items or issues addressed as concerns in the Inspection Reports." Addison then underwent efforts to fix all of the Addendum issues and, while repairs were still ongoing, the parties closed on the home. At closing, Addison Construction provided Buyers with a Warranty as required by the Purchase Agreement. The Warranty provided that Addison Construction agreed to repair any work that was proven to be defective within one year of the closing date.

In May of 2008, after Addison was done with its Addendum work, Buyers moved into the home. Shortly thereafter, Buyers began to notice that that the home still had moisture intrusion issues. Buyers contacted Addison in August of 2008 and made a warranty claim. After conducting additional testing, Addison discovered the presence of mold and water damage along the east wall of the master bedroom. At this point, Addison disclosed the fact that the master bedroom suffered water damage during 2005's Hurricane Wilma. This admission alarmed Buyers and caused them to question the integrity of the home's overall construction.

Thereafter, Buyers performed extensive testing throughout the home and discovered numerous additional latent defects. Having "lost trust" in Addison and Sellers at this point, Buyers sent Addison and the Sellers notice that they were in default of their respective obligations under the Purchase Agreement, Addendum, and Warranty. A few months later, Buyers filed their lawsuit against Addison, Mr. Swanson, Sellers, and twelve of the subcontractors who worked on the home.

Against Addison, the Buyers alleged causes of action for violation of the Florida Building Code, breach of contract, negligent failure to disclose, fraud, and violation of Florida's Deceptive and Unfair Trade Practices Act

("FDUTPA"). Against Sellers, they alleged causes of action for breach of contract, negligent failure to disclose, fraud, violation of FDUTPA, and securities fraud. Against the subcontractors whom they were not in privity with, Buyers alleged a cause of action for violation of the Florida Building Code. Finally, against Mr. Swanson, they alleged causes of action for violation of the Florida Building Code, negligent failure to disclose, fraud and FDUTPA. Because the Purchase Agreement and Warranty contained a jury trial waiver, all claims against Sellers and Addison were set for a bench trial. The remaining claims, including the claims against Mr. Swanson, were set for a jury trial.

Before trial, Buyers settled with ten of the subcontractors. The sum total of the Buyers' settlements with the subcontractors was $2,725,000. Buyers moved in limine to exclude mention of these settlements. In their motion, Buyers represented that the settlements resolved their building code claims against Mr. Swanson as well as their building code claims relating to: the main entry door of the house, stucco, cast stone, exterior balcony and interior railings, steel columns and beams, truss girder hanger, concrete defects, exterior wall coverings in the summer kitchen, roof trusses, HVAC, electrical, and plumbing. They also argued that although "evidence of the settlement discussions and negotiations pertaining to these issues may be relevant as evidence of a setoff to any damages awarded to [Buyers], . . . evidence relating to setoff is premature [and] should be made at the conclusion of the trial outside the jury's presence so as to not confuse or unduly prejudice the jury." The court granted Buyers' motion without elaboration.

Following nearly ten weeks of evidence and testimony, the jury entered a special verdict wherein it found that neither of the two remaining subcontractors (the roofer and window/door installer) violated the Florida Building Code. The jury also found that Mr. Swanson did not violate FDUTPA but did knowingly made a false statement or intentional omission concerning the Hurricane Wilma water damage with the intention that Buyers would rely on the statement or omission and which reliance called injury to Buyers. Based on its fraud finding, the jury awarded Buyers $78,984.30 in damages against Mr. Swanson.

After the non-jury proceedings, the court entered an extensive order making detailed and thorough findings regarding the defects in the home and Buyers' entitlement to damages. The court found that none of the parties violated the Florida Building Code, FDUTPA, or committed the tort of negligent failure to disclose. Likewise, it found that Sellers did not commit securities fraud. It did find, however, that Addison committed fraud by failing to disclose, post-closing, information "regarding water

4

entry into the Home associated with Hurricane Wilma and leaking through or around the center window in the Master Bedroom." It also found that when Addison committed the fraud, it was acting as Sellers' actual and apparent agent and, therefore, also found Sellers liable. Finally, the court found that Addison and Sellers breached their respective contractual duties under the Purchase Agreement, Addendum, and Warranty.

With respect to damages, the court found that Buyers were entitled to a total of over $3.5 million in damages associated with the repair and loss of use of their home. It found that $2,525,684.72 of those damages were recoverable against Addison Construction under the Warranty; $3,339,654.04 were recoverable against Addison Development and Sellers under the Addendum; and $2,365,651.01 were recoverable against Sellers under the Purchase Agreement. Many of these damages overlapped.

Pertaining to its fraud finding, the court found that Buyers would not have incurred some of the afore-outlined repair and loss of use damages had Addison and Sellers disclosed their water intrusion knowledge earlier on. The court found that Buyers incurred $78,984.30 in damages flowing from this fraud, which was comprised of Buyers' inspection fees and the cost of replacing the wood floors in the master bedroom. These damages also overlapped with the breach of contract damages and the fraud damages against Mr. Swanson.

Post-trial, Mr. Swanson, Sellers and Addison moved for the court to apply the subcontractor settlements as setoffs against each of the judgments. Looking at the scope of the subcontractor settlements as outlined in the individual releases and comparing them with the damages requested and recovered by Buyers in their breach of contract claims against Addison and Sellers, the court determined that "the pleadings, evidence, and argument [do not] demonstrate that [Buyers] either reduced their claims for damages at trial or removed claims for damages at trial related to the settled scopes of work that will have an impact on the Court's evaluation of whether to award [Addison and Sellers] a set off prior to the entry of a Final Judgment." Therefore, the court granted Addison and Sellers a setoff of the subcontractor settlements against the breach of contract awards. However, the court reached a different conclusion with respect to the fraud awards. It found that the a setoff was not warranted because "there were no allegations, evidence or arguments that Mr. Swanson[, Addison, and Sellers] could be liable [for] fraud based upon any actions of the Settled Defendants."

Thereafter, the court entered an Omnibus Final Judgment as to all of Buyers' non-jury claims against Sellers and Addison. In the judgment, the

court awarded Buyers the following amounts, which accounted for the setoffs and prejudgment interest: 1) $518,606.89 against Addison Construction under the Warranty; 2) $2,652.284.83 against Addison Development and Sellers under the Addendum; 3) $852,920.84 against Sellers under the Purchase Agreement; and 4) $120,341.78 against Addison and Sellers for Fraud. These appeals follow.

## Analysis

### 1) *Form of the Judgments*

We begin our analysis by addressing the court's decision to reduce the fraud damages against the parties and the damages under each contract to separate judgments. It is undisputed that each of these judgments contained overlapping damages. For example, all of the fraud and contract judgments encompassed damages associated with replacing the master bedroom floor. It is also undisputed that under Florida law, a party is not permitted to recover for the same damages more than once. What is disputed is whether the potential for double recovery needed to be addressed pre-judgment or post-judgment. Addison argues the judgments should have indicated they were joint and several on their face. Buyers counter that Addison is arguing about a "non-issue" because the "law is clear that a party may not collect the same damages twice [and this] is a collection issue."[1] We agree with Buyers.

The Restatement of Judgments is instructive to this issue. Section 49 of the Second Restatement provides that:

> A judgment against one person liable for a loss does not terminate a claim that the injured party may have against another person who may be liable therefor.

Restatement (Second) of Judgments § 49 (Am. Law Inst. 1982). The author of the restatement explained the rational for this rule as follows:

> When a person suffers injury as the result of the concurrent or consecutive acts of two or more persons, he has a claim against each of them. . . . Accordingly, a judgment for or against one obligor does not result in merger or bar of the claim that the injured party may have against another obligor. . . . The rule that there are separate claims against each

---

[1] Sellers made their own argument against multiple judgments in their brief but abandoned the argument and sided with Buyers' position at oral argument.

obligor applies whether the obligation results from a tort, a breach of contract, or other obligation.

. . .

Under rules originating in an early period of legal development, however, rendition of judgment against one of several obligors sometimes had the effect of extinguishing a claim against another. Some of these rules were based on the notion that a "joint" obligation could be enforced only through a single action. . . . Other rules having like effect were expressed in terms of requiring an "election of remedies." Both types of rules were often justified as a means of preventing double recovery for the loss involved. These rules are now obsolete. Double recovery is foreclosed by the rule that only one satisfaction may be obtained for a loss that is the subject of two or more judgments.

Restatement (Second) of Judgments § 49 cmt. a (Am. Law Inst. 1982).

The "rule" of satisfaction as a preventive to double recovery is set forth in section 50 of the Restatement as follows:

When a judgment has been rendered against one of several persons each of whom is liable for a loss claimed in the action on which the judgment is based:

(1) A satisfaction or release of the judgment, or covenant not to execute upon it, or other agreement terminating in whole or in part the judgment debtor's obligation, does not discharge the liability of any of the other persons liable for the loss, except:

a. To the extent that the agreement may so provide; and

b. To the extent required by the law of suretyship.

(2) Any consideration received by the judgment creditor in payment of the judgment debtor's obligation discharges, to the extent of the amount of value received, the liability to the judgment creditor of all other persons liable for the loss.

Restatement (Second) of Judgments § 50 (Am. Law Inst. 1982).

The basis of the foregoing principles is rooted in fairness: if a party is unable to collect on a judgment, it should not be precluded from seeking other consistent but separate manners of recovery against equally liable persons. *See Heller v. Held*, 817 So. 2d 1023, 1027 (Fla. 4th DCA 2002) (attorney who held a charging lien and judgment against client in a case which settled after attorney withdrew was not precluded from seeking recovery from settling defendants whose actions thwarted attorney's enforcement of lien against settlement proceeds). Alternatively, if in satisfying a judgment, a party recovers damages encompassed by another outstanding judgment, it should not be entitled to double recovery. *Id.* Based on the foregoing, Buyers properly obtained multiple judgments against different parties for overlapping damages. Buyers may not, however, satisfy each judgment entirely. Rather, Mr. Swanson, Addison, and Sellers may use satisfaction of any of the overlapping items of compensation in the various judgments as bar to payment of the remaining judgments. But, as argued by Buyers, this is a post-judgment collections issue.

### 2) The Setoff Ruling

Addison, Mr. Swanson, and Buyers each take issue with the court's setoff determinations. Addison and Mr. Swanson maintain that the court should have extended the subcontractor settlement setoff to the fraud judgments entered against Addison and Mr. Swanson. In their cross-appeals, Buyers argue that the court erred in applying the entirety of the $2.75 million subcontractor settlements as a setoff to the damage awards against Addison and Sellers under the Purchase Agreement, Addendum and Warranty. Buyers assert several grounds for this argument, the main ground being that the damages encompassed by the subcontractor settlements did not overlap with the contract based damages awarded against Addison and Sellers. We hold that the trial court properly applied the subcontractor settlements as a setoff against all of the breach of contract awards and properly denied a setoff with respect to the fraud awards.

"Whether the trial court awarded a proper set-off is a pure question of law reviewed *de novo*, and 'no deference is given to the judgment of the lower courts.'" *Cornerstone SMR, Inc. v. Bank of Am., N.A.*, 163 So. 3d 565, 568 (Fla. 4th DCA 2015) (quoting *D'Angelo v. Fitzmaurice*, 863 So. 2d 311, 314 (Fla. 2003)). Setoffs for collateral recoveries are available pursuant to sections 768.041(2) and 46.015(2) of the Florida Statutes, (2015). Both sections contain nearly identical language, however, section 46.015 is located in the civil practice and procedure title of the Florida Statutes and

section 768.041 is located in the torts title. Because the instant case was founded in contract and not in tort, the court found that section 46.015(2) was the controlling statute. To that end, section 46.015(2) provides that if a defendant demonstrates that a plaintiff has released "any person in partial satisfaction of the damages sued for, the court shall set off this amount from the amount of any judgment to which the plaintiff would be otherwise entitled at the time of rendering judgment." § 46.015(2), Fla. Stat. (2015).

The purpose of the setoff statutes is to prevent a windfall to a plaintiff by way of double recovery. *See Cornerstone*, 163 So. 3d at 569 ("The set-off provision in section 768.041(2) 'was designed to prevent duplicate or overlapping compensation for identical damages.'" (quoting *Gordon v. Marvin M. Rosenberg, D.D.S., P.A.*, 654 So. 2d 643, 644 (Fla. 4th DCA 1995)). Thus, any "settlement recovery sought to be set off must be 'in partial satisfaction for the damages sued for.'" *Escadote I Corp. v. Ocean Three Ltd. P'ship*, 211 So. 3d 1059, 1062 (Fla. 3d DCA 2016) (quoting § 768.041(2), Fla. Stat. (2010)). Accordingly, "[i]f the settlement funds are applicable to a claim asserted only against the settling co-defendant, the non-settling co-defendants are not eligible for a set-off in the amount of the settlement." *Id.* In the same vein, "[w]hen a settlement recovery is allocated between claims with different and distinctive damage elements, set-off should only be allowed to co-defendants jointly and severally liable for the **same** claims." *Id.* at 1063 (emphasis provided).

The necessity of same damages sued for as a prerequisite for a setoff is illustrated by *Escadote I Corp.* There, the owner of a condo unit sued the developer, contractor and condo association, alleging several causes of action based on the presence of mold in the condo unit. 211 So. 3d 1060–61. Against the condo association, the owner alleged a statutory claim for failure to maintain which also included a demand for attorney's fees under the applicable statute. *Id.* at 1061. The owner did not make any claim of attorney's fees against either the contractor or developer. *Id.* at 1063–64. Before the jury returned its verdict, the owner settled its claim against the association for $375,000. *Id.* at 1061. The settlement agreement delineated that $500 of the settlement was attributable to damages and the remaining sum was intended to reimburse the owner for its attorney's fees. *Id.* The jury found the developer and contractor jointly and severally liable for over $2 million in damages. *Id.* Thereafter, the developer and contractor successfully moved to apply the entirety of the owner's settlement with the condo association as a setoff against the damages awarded against them. *Id.* at 1062. The appellate court reversed, holding that because the owner did not make any claim for attorney's fees against either the developer or contractor, the portion of the condo

association settlement which was specifically apportioned for attorney's fees could not be applied as a setoff against the damages awarded against the contractor and developer. *Id.* at 1063–65.

In comparison, in *Centex-Rooney Construction Co., v. Martin County.*, 706 So. 2d 20, 29 (Fla. 4th DCA 1997), we held that a county's pretrial settlements with the architect and mason who worked on the construction of a courthouse were correctly applied as a setoff to the county's recovery against the construction manager because the "County's claimed damages [recovered against the construction manager] were not separate and distinct from the damages compensated by its settlements."

Although the same-damages-sued-for prerequisite seems simple enough in theory, because settlement agreements are often so broadly worded, in practice it is not always easy to determine whether damages paid as part of a settlement overlap with damages awarded against a remaining co-defendant. To that end, the law provides that if settlement proceeds are "not apportioned between (a) claims for which co-defendants are jointly and severally liable with the settling co-defendant, and (b) claims which were only asserted against the settling co-defendant, the entire amount of the undifferentiated recovery is allowable as a set-off." *Escadote I Corp.*, 211 So. 3d at 1063. *See also Cornerstone*, 163 So. 3d at 569 ("Where a settlement is undifferentiated and general, the aggregate of the amount of the settlement should be set off against the judgment."). This is the case even where some of the settlement amount may have been for different damages and the settlement amount exceeded the damages it setoff. *See Cornerstone*, 163 So. 3d at 569.

For example, in *Cornerstone*, a company sued its former bookkeeper for conversion after it learned that over the course of four years, the bookkeeper deposited $478,490 worth of checks made out the company in her own account at Bank of America. *Id.* at 566–67. The company also sued Bank of America for its role in allowing the bookkeeper to deposit the stolen checks in her account. *Id.* at 566. Prior to trial, the company settled with the bookkeeper for $285,625. *Id.* at 571. It was then awarded $146,743.23 in damages against Bank of America, a number which was far lower than the company's actual damages because the statute of limitations barred recovery against the bank for about two-thirds of the embezzled checks. *Id.* at 567. Bank of America moved to apply the company's settlement with the bookkeeper as a setoff against its liability. *Id.* The company, in turn, argued that setoff was not appropriate because the settlement with the bookkeeper covered damages not encompassed by the award against Bank of America due to the operation of the statute of limitations. *Id.* Attempting its best to do equity, the court pro-rated the

settlement with the bookkeeper based on the percentage of checks cashed after the statute of limitations bar and applied the pro-rated number as a setoff. *Id.* at 568.

On appeal, we reversed the trial court's pro-rated setoff and held that the entire bookkeeper settlement amount should have been applied as a setoff against the Bank of America award. *Id.* at 569. The basis of our decision was that the company's settlement agreement with the bookkeeper "did not allocate the damages between claims." *Id.* Although we recognized that the settlement probably encompassed damages which the company could not recover against Bank of America due to the statute of limitations and, therefore, may have provided a windfall to the Bank, we reasoned that it was the company's "own failure to allocate the settlement agreement which has produced this result." *Id.* at 570. We concluded that without an allocation, it was simply "impossible to know whether [the company] would be receiving a duplicate payment" and therefore, the trial court was required to offset the damage award against the bank by the total amount of the bookkeeper settlement. *Id.* In doing so, we also rejected the company's attempt to explain the scope of its settlement agreement with the bookkeeper based on authority establishing that courts are required to "'ignore a private unilateral apportionment of settlement proceeds among plaintiffs, when the settlement agreement itself fails to apportion the proceeds among the plaintiffs.'" *Id.* at 569 (quoting *Dionese v. City of W. Palm Beach*, 500 So. 2d 1347, 1348 (Fla. 1987)).

In the instant case, the court underwent a thorough analysis utilizing the foregoing principles when arriving at its setoff determination. Specifically, it looked at the scope of each subcontractor settlement and compared it to the damages Mr. Swanson, Addison and Sellers were "sued for." The court began by examining the controlling complaint, wherein Buyers alleged a singular cause of action against each of the settled subcontractors for violation of the Florida Building Code. Within that count, Buyers alleged that because of the various subcontractors' defective workmanship, Buyers "suffered both direct and special damages, including, without limitation, consequential loss of use of the Residence, diminution in value, carrying costs, relocation expenses, expert testing and consulting expenses, legal expenses, property damage, repair costs, replacement material and supply expenses, security and staff expenses, moving and storage expenses, taxes, interest and insurance expenses, permit and inspection expenses, and other consequential damages." In their breach of contract(s) count against Sellers and Addison, Buyers alleged that they suffered the exact damages. In the fraud counts, however, the Buyers alleged that the damages they suffered were those flowing from Mr. Swanson, Addison, and the Seller's intentional failure to

disclose and cover up of construction defects which caused water intrusion in the home.

Based on the allegations of the complaint, the court found that a setoff against the fraud judgments was not warranted because "there were no allegations, evidence or arguments that Mr. Swanson[, Addison, and Sellers] could be liable [for] fraud based upon any actions of the Settled Defendants." The court's finding in this respect was sound. As discussed in greater detail above, the settlements with the settled subcontractors were for damages caused by their respective scopes of work on the home. Alternatively, the damages "sued for" under the fraud counts were those flowing from Mr. Swanson's, Addison's, and the Seller's intentional failure to disclose water damage. These are not the same.[2]

Turning to the contract based damages, the court found that the damages "sued for" under the contracts and the damages "sued for" under the count against the subcontractors were identical. Buyers argue that this determination was erroneous because the scope of damages they sought against the subcontractors should be dictated by what they could have actually recovered against the subcontractors, not what they claimed in their complaint. The law suggests otherwise. The plain language of section 46.015(2) establishes that when determining whether to apply a settlement as a setoff, the court must determine if the settlement was made "in partial satisfaction of the damages sued for." § 46.015(2), Fla. Stat. Accordingly, when making a setoff decision, it does not matter what the party was actually entitled to recover, "[i]nstead, what matters is [what the plaintiff] sued for." *Blasland, Bouck & Lee, Inc. v. City of N. Miami*, 283 F. 3d 1286, 1296 (11th Cir. 2002) (interpreting section 46.015(2)). Here, although Buyers may not have been entitled to recover all damages requested in their complaint against each of the settled subcontractors, the fact remains that those are the damages they "sued for."

---

[2] This is not to say that Buyers may actually satisfy both the fraud and the breach of contract judgments as they contain duplicate items of compensation. *See Fla. Temps. Inc. v. Shannon Props., Inc.*, 645 So. 2d 102, 104 (Fla. 2d DCA 1994) (holding that because a plaintiff was not entitled to recover "damages for fraud that duplicate damages awarded for breach of the contract," the court was required to enter a judgment "clarifying whether any award for breach of contract duplicates an award for fraud" in order to prevent the plaintiff from recovering both). However, it remains that under these circumstances, a setoff was not the proper mechanism to prevent double recovery. Rather, as discussed in our analysis on the form of judgment issue, Mr. Swanson, Addison, and Sellers may use satisfaction of any of the overlapping items of compensation in the breach judgments as a bar to payment of the fraud judgments.

Next, the court looked to each of the settlement agreements to determine their respective scopes. The court noted that each of the settlement agreements and releases between Buyers and the settled subcontractors provided that Buyers "agreed not to seek recovery against Mr. Swanson and [Addison] for damages allegedly caused by each Settled Defendant's respective scope of work." None of the settlement agreements differentiated the damages being settled for and all contained broad releases of the settled subcontractors which were not limited to releases for damages related to violation of the Florida Building Code. Based on the foregoing, the court concluded that neither "the pleadings, evidence and argument demonstrate that [Buyers] either reduced their [contract based] claims for damages at trial or removed claims for damages at trial related to the settled scopes of work that will have an impact on the Court's evaluation of whether to award the Defendants a set off prior to the entry of Final Judgment."

Buyers also disagree with this conclusion, arguing that the court should have interpreted the settlement agreements consistent with the narrowness of the facts of the case and not the broadness of their language. In support of their position, Buyers point to testimony offered at the hearing on their motion for reconsideration of the court's setoff determination. There, Buyers' engineering expert testified that none of the evidence of damage to the home presented at trial was encompassed by the subcontractor settlements. However, this post-settlement attempt to differentiate the damages settled-for has no legal effect. As we explained in *Cornerstone,* a court may not apportion settlement proceeds based on the representation of one of the settling parties when the agreement itself does not do the same. 163 So. 3d at 569–70. *See also Nauman v. Eason*, 572 So. 2d 982, 983–85 (Fla. 1st DCA 1990) (holding that it was error for trial court to apportion settlement agreement among plaintiffs where settlement was silent on the subject).

Lastly, Buyers assert that the end result was unfair, emphatically arguing that Addison and Sellers ultimately received a setoff for damages not recovered in the damage awards against Addison and Sellers. They point to their settlement with a pool subcontractor as an example. There is no dispute that Buyers did not present any evidence of pool damage during either trial and there is also no disputing that the court did not delineate any damages specific to a pool in its final judgment. Although it seems likely that Addison and Sellers received a setoff for pool damages that were not awarded, because the settlement agreement with the pool contractor does not differentiate the settled damages, arriving at the conclusion proffered by Buyers still requires a degree of speculation—the court would have to assume that any damages caused by the pool

subcontractor were to the pool. But, what if the pool contractor caused damage to the surrounding landscaping features during their work on the pool? What if during settlement talks Buyers claimed that they should be reimbursed for their loss of use of the pool while it was being repaired? Buyers sued the subcontractors, Sellers, and Addison for a wide range of damages and as a result, paver damage, landscaping lighting damage, and loss of use were all elements of compensation awarded against Addison and Sellers. Without differentiation in the settlement agreement, there is simply no way to know if there was any overlap.

Further exemplifying the need for allocation of damages in a settlement agreement to prevent duplicate recovery are Buyers' settlements with the stucco, cast-stone, and the painting and caulking subcontractors. Buyers claim that they did not introduce any evidence of settled damages caused by these subcontractors, but as the court outlined in its final omnibus order, Buyers' evidence showed that "the construction elements that may (or in specific instances may not) have contributed to the water intrusion include, but are not necessarily limited to, improper or no waterproofing, painting, calking, stucco, and cast stone installation." Without differentiation, it seems more than likely that the settlement agreements with stucco, cast-stone, and painting and caulking subcontractors (just as an example) encompassed damages awarded against Addison and Sellers under the Purchase Agreement, Addendum, and Warranty.

In sum, because the subcontractor settlement agreements failed to differentiate the damages settled for, it is simply "impossible to know whether [Buyers] would be receiving a duplicate payment" for their breach of contract based claims. *Cornerstone*, 163 So. 3d at 569–70. If Buyers wanted to prevent this problem, they should have allocated the damages encompassed in each subcontractor settlement. Buyers made a strategic and understandable decision not to do so, and this is the end result. We acknowledge that this may seem harsh, but it is the only pragmatic result. If courts were required to delve into the scope of undifferentiated settlement agreements for the purposes of making a setoff determination, then post-judgment proceedings would turn into a second trial. Principles of judicial economy prohibit this result. Accordingly, under the direction of *Cornerstone*, the trial court was required to offset the breach of contract damages awarded against Addison and Sellers by the total amount of the subcontractor settlements. *Id.*

**Conclusion**

Although this was an extremely complicated and lengthy case, the record, especially the trial court's many orders, reflect that the court spent

a great deal of time considering and carefully analyzing each of the issues raised on appeal and, in doing so, ensured that the parties had a fair trial based on the evidence.  Under the circumstances, we affirm in all respects.

*Affirmed.*

WARNER and MAY, JJ., concur.

*     *     *

**_Not final until disposition of timely filed motion for rehearing._**