706 So.2d 20 (1997)
CENTEX-ROONEY CONSTRUCTION CO., INC., Seaboard Surety Company, St. Paul Fire and Marine Insurance Company, and The American Insurance Company, Appellants/Cross-Appellees,
v.
MARTIN COUNTY, Florida, Appellee/Cross-Appellant.
No. 96-2537.
District Court of Appeal of Florida, Fourth District.
December 31, 1997.
Rehearing, Rehearing and Certification of Conflict Denied March 11, 1998.
*23 John E. Beranek of McFarlane Ausley Ferguson & McMullen, Tallahassee, and Michael E. Jaffe, David T. Dekker, and Bryan J. Sinclair of Arent Fox Kintner Plotkin & Kahn, Washington, DC, for Appellant/Cross-Appellee Centex-Rooney Construction Co., Inc.
James E. Glass, Sara Joanne Greer, and Andre Zamorano of James E. Glass Associates, Miami, for Appellants/Cross-Appellees Seaboard Surety Company, St. Paul Fire and Marine Insurance Company, and The American Insurance Company.
Daniel S. Pearson, Leslie K. O'Neal and Steven R. Schooley of Holland & Knight LLP, Orlando, for Appellee/Cross-Appellant Martin County, Florida.
Rehearing, Rehearing En Banc and Certification of Conflict Denied March 11, 1998.
PER CURIAM.
This appeal arises from a final judgment of over $14 million against the construction manager of the Martin County Courthouse, resulting from construction defects revealed in a "sick building" case. The construction manager and its sureties appeal, claiming several evidentiary failings in the record. The appellee cross-appeals the trial court's set-off of the jury verdict by amounts paid by settling defendants. We affirm on all issues.
Martin County ("County") commenced plans to construct its courthouse and constitutional office building in 1985. The project architect completed the original plans and specifications for these buildings in April of 1987. Several months later, appellant Centex-Rooney Construction, Inc. ("Centex") entered into a construction management agreement with the County to serve as the construction manager for the entire project. Centex and the other appellants, Seaboard Surety Company, St. Paul Fire & Marine Insurance Company, and the American Insurance Company (collectively "the Sureties"), jointly issued a performance bond and a payment bond to the County, jointly and severally binding themselves to ensure the proper performance of the construction management agreement. Centex also assumed complete oversight and control of the project, including responsibility for the selection of all subcontractors as well as the supervision, coordination, management, and inspection of their work.
Centex retained several trade contractors to perform various aspects of the construction, and the courthouse complex was certified substantially complete on December 12, 1988. Following its occupation of the courthouse and office building in early 1989, the County made several complaints to Centex about window and exterior wall leaks in these buildings, mold growth and excessive humidity. Centex's own employees acknowledged and documented water infiltration through the exterior synthetic hardcoat systems *24 ("EIFS system"), as a result of defective installation, which led to leaks and resultant mold growth in the buildings. An investigation also revealed several problems with the buildings' heating, ventilation and air conditioning ("HVAC") systems. In addition, the County received several complaints of health problems from the buildings' occupants and visitors, and approximately twenty-five percent of the occupants evacuated the buildings before December of 1992. Concerned with the health issues, the County retained an environmental firm to perform tests to identify the potential causes of the indoor air quality problems and engaged an engineering consultant to conduct a complete analysis of their HVAC systems. Although the County took several measures to improve the buildings' air quality and repair the leaks, the humidity problems remained unresolved.
Dr. Hodgson, one of the County's retained experts specializing in indoor air quality, conducted tests in conjunction with a pulmonary physician and concluded that several of the buildings' occupants had signs and symptoms consistent with work-related asthma. In September of 1992, representatives of the County, the constitutional officers, and the building occupants formed a courthouse advisory committee for the purpose of investigating the occupants' concerns. The following month, the County filed suit against several defendants, including Centex, the Sureties, the project architect, and the concrete and masonry construction company, for breach of contract and negligence, alleging improper design and construction.[1]
Because health complaints continued, the County retained Dr. Morey, another expert in indoor air quality, for a second opinion on the courthouse's and office building's indoor air quality issues. The results of Dr. Morey's air and bulk sample testing in the buildings indicated a significant presence of two highly unusual and toxigenic molds. He reported the presence of these molds to the advisory committee and recommended that the County obtain a medical opinion to advise the building's occupants about the potential risks associated with the molds. When Dr. Morey's follow-up testing revealed the same results, he advised the County to remove the moldy ceiling tiles, wallboards, carpet, and other moldy material from the buildings, using hazardous waste disposal techniques.
On December 8,1992, on its own initiative, the advisory committee voted in favor of evacuating the courthouse and office building. The committee relied upon information obtained from Dr. Hodgson and Dr. Morey in making its decision but did not receive any specific directive to evacuate from them. The committee members did not believe that they could, in good faith and good conscience, ask the County's employees, the litigants, the attorneys, and the general public to enter these buildings under the existing conditions. This evacuation required the relocation of all County employees from these buildings to remote work sites. The County hired a coordinator for the remediation of the buildings, an engineering firm to advise on building repair, and an environmental firm to assist with removal of the molds.
The County subsequently engaged a remediation firm and instructed it initially to remove dry wall and outer coverings in only specified contaminated areas of the courthouse and office building. However, as the rough walls were exposed, there was more visible mold and water damage than previously anticipated, requiring extensive demolition. Sixty to sixty-five percent of the exterior walls had visible mold on them. During this procedure, the County became aware of a multitude of hidden and dangerous structural and electrical defects,[2] which substantially expanded the scope of the remediation *25 process and increased the cost for redesign, reconstruction, and relocation.
At the conclusion of the trial, the jury returned a verdict in the amount of $11,550,000 against Centex and the Sureties, which the court reduced by $2,750,000, representing the amount which the County had received in pretrial settlements. The court subsequently entered an amended final judgment for $14,211,156, comprised of $8,800,000 in damages, plus $5,411,156 in prejudgment interest calculated from December 12, 1988 through June 18, 1996. Centex and the Sureties appeal this final judgment.
The thrust of the County's cause of action against Centex for breach of contract was that Centex failed to properly supervise the construction, resulting in shoddy workmanship and extensive damage. We find that the County presented sufficient evidence to meet its burden of proving that Centex's breach of its contractual responsibilities was a substantial factor in causing the County's extensive damages. See Tuttle/White Constructors, Inc. v. Montgomery Elevator Co., 385 So.2d 98,100 (Fla. 5th DCA 1980) (citing 5 Corbin, Corbin on Contracts § 999, at 24-25 (1964)). First, it proved that Centex's construction defects caused moisture problems in the buildings, resulting in extensive mold growth. Centex's own employees acknowledged that its subcontractors' defective installation of the EIFS system and windows led to extensive water infiltration and resultant mold growth. Second, the County established through expert testimony that, because of this moisture, the buildings were infested with two highly unusual toxic molds. Third, several experts attested to the accepted scientific principle linking exposure to these two molds with health hazards. Fourth, the County established that the purpose of its ensuing remediation process was to remove the existing mold and prevent new mold growth by finding and correcting exterior wall and window leaks and other causes of excessive moisture and humidity. It was during this process that the County became aware of a myriad of previously unknown and serious structural and electrical defects, several of which contributed to the water infiltration and resulting mold infestation. Finally, the County demonstrated that these defects, caused by Centex's subcontractors, expanded the scope of the remediation process, thereby justifying the increased costs for redesign, repair, reconstruction, and relocation. Based on the foregoing, we find that the County established Centex's liability by proving that its breach of the construction management agreement was a substantial factor in causing the County's significant damages.
Centex's claim that the County was required to prove that the construction defects caused an actual health hazard misses the mark. It places great importance on the lack of proof of an actual health threat to justify an evacuation of the buildings. As we understand this position, if the County had not evacuated, then it would not have stripped down the walls which revealed the serious construction defects in the buildings. The County, however, could have called for the evacuation of the buildings just so that it could have performed a more extensive investigation and thereby discovered the same problems. Then an evacuation of all of the occupants would have still been necessary to allow the completion of all of the remedial measures. We think it important to observe that Centex has never contested the fact that there were serious and substantial defects in the buildings. The reason for the evacuation and whether that reason was supported by the evidence was immaterial to the elements that the County was required to prove in its contract action.
Centex further asserts that the trial court erred in denying the admission into evidence of the environmental testing firm's report, which indicated that the fungal and bacterial levels inside the courthouse were two to ten times lower than outside the courthouse. We agree that the court's exclusion of this report, due to Centex's failure to strictly comply with a pretrial order to list expert witnesses, was an abuse of discretion. There was no evidence that the introduction and use of this report would have prejudiced the County or substantially endangered the fairness of the proceedings. See Binger v. King Pest Control, 401 So.2d 1310, 1313-14 (Fla.1981)(trial court's broad discretion in determining *26 whether to exclude testimony of witness not disclosed pursuant to pretrial order is guided by determination of prejudice to objecting party).
Nevertheless, "[a] trial court's error in admitting or rejecting evidence does not necessarily constitute harmful error." Forester v. Norman Roger Jewell & Brooks Int'l, Inc., 610 So.2d 1369, 1372 (Fla. 1st DCA 1992). The trial court's judgment should be reversed only where it appears that such error "injuriously affect[ed] the substantial rights of the complaining party. ..."Id. (citations omitted); see also § 59.041, Fla. Stat. (1995)(judgment should not be reversed unless, after examination of entire case, it appears that error complained of resulted in miscarriage of justice). The trial court permitted Centex to present several of the report's critical findings supporting Centex's position to the jury through the testimony of other witnesses. Centex's claim that the jury could not truly evaluate the reasonableness of the County's decision to evacuate the courthouse and reconstruct a new facility without considering the entire contents of this report is unpersuasive. Even assuming, arguendo, that the County's temporary evacuation for the mold removal process was unreasonable, its subsequent fortuitous discovery of the structural and electrical defects during that process clearly warranted the relocation of its employees and the redesign and reconstruction of the courthouse. Thus, Centex cannot reasonably claim that the exclusion of this report injuriously affected its substantial rights. Viewed in the context of the entire trial, any error in the court's exclusion of this report from evidence was harmless.
Concentrating on the issue of the scientific evidence of a health hazard, Centex also objects to the court's admission of Dr. Morey's and Dr. Hodgson's expert testimony which suggested the existence of a health hazard stemming from the toxic molds found in the buildings. We affirm the trial court's admission of this testimony. During the trial, the court conducted Frye[3] hearings before allowing these experts to testify. The purpose of a Frye hearing is to determine "whether the expert's testimony is based on a scientific principle or discovery that is `sufficiently established to have gained general acceptance in the particular field in which it belongs.'" Ramirez v. State, 651 So.2d 1164, 1167 (Fla.1995)(quoting Frye, 293 F. at 1014). The supreme court has emphasized that in utilizing the Frye test,
the burden is on the proponent of the evidence to prove the general acceptance of both the underlying scientific principle and the testing procedures used to apply that principle to the facts of the case at hand. The trial judge has the sole responsibility to determine this question. The general acceptance under the Frye test must be established by a preponderance of the evidence.
Ramirez, 651 So.2d at 1168.
Centex claims that the scientific principle underlying Dr. Morey's and Dr. Hodgson's expert testimony, studies linking exposure to the toxic molds found in the buildings with health risks, was not generally accepted in the scientific community. We distinguish Porter v. Whitehall Laboratories, Inc., 9 F.3d 607 (7th Cir.1993), relied on by Centex. Unlike the expert in that case, who had no scientific support for her opinion, Dr. Morey and Dr. Hodgson each testified about numerous publications accepted in the scientific community recognizing the link between exposure to the highly unusual toxigenic molds and adverse health effects. Based on our de novo review of the evidence, see Brim v. State, 695 So.2d 268, 274 (Fla.1997), we find that the County met its burden under Frye of proving by a preponderance of the evidence that the basic underlying principles of scientific evidence were sufficiently tested and accepted by the relevant scientific community. We also find Centex's argument concerning the use of Dr. Hodgson's opinion testimony as a conduit for inadmissible hearsay opinions to be without merit. See § 90.702, Fla. Stat. (1995)(expert opinion admissible to assist jury in understanding evidence or determining fact in issue); Thunderbird, Ltd. v. Great Am. Ins. Co., 566 So.2d 1296, 1305 (Fla. 1st DCA 1990)(expert not *27 conduit for inadmissible hearsay if opinion supported by accurate and adequate testimony based on facts and data reasonably relied upon and utilized by experts in field).
Centex further claims that the County failed to present sufficient evidence upon which the jury could properly base its damage award. In a case involving the breach of a construction contract, a recognized measure of damages is the reasonable cost of performing construction and repairs in conformance with the original contract's requirements. See Grossman Holdings Ltd. v. Hourihan, 414 So.2d 1037, 1039 (Fla.1982); Temple Beth Sholom and Jewish Ctr., Inc. v. Thyne Constr. Corp., 399 So.2d 525, 526 (Fla. 2d DCA 1981). Such damages also include relocation and financing costs, see Tillman v. Howell, 634 So.2d 268, 271 (Fla. 4th DCA 1994), and the engineering and architectural fees reasonably necessary to accomplish the reconstruction. See Temple Beth Sholom, 399 So.2d at 526. In such a case, the nondefaulting party must show actual expenditures occasioned by the breach, and the defaulting party has the burden to show the unreasonableness of these expenditures. See Tuttle White, 385 So.2d at 100.
At trial, several County witnesses testified about the actual costs incurred for demolition, redesign, and reconstruction of the buildings, relocation and financing. The County introduced several boxes of vouchers and checks relating to its relocation and reconstruction expenses through its budget administrator. The County's damage expert, Mark Gauthier, testified that he reviewed and analyzed reports received from the County, which detailed the expenses incurred with respect to the sick building issue, and accumulated information from these reports in a computer database. He explained that he examined each expenditure and, upon ascertaining its purpose, determined whether it should be claimed or unclaimed, placing all expenses relating to upgrades, as well as all unresolved and questionable expenses, in the unclaimed category. Gauthier testified that the County did not claim reconstruction expenses for any upgrades or improvements over the original plans and specifications; relocation expenses for furniture cleaning, storage, new furniture, water bottle rentals, lease deposits, utilities or janitors; or financing expenses for anything other than the new construction. Over Centex's foundation and relevance objections, the court allowed Gauthier to testify from a prepared summary report, which was projected on a screen (but not placed in evidence), that recapitulated the County's claimed and unclaimed expenses for reconstruction, relocation, and financing. He then deflated the County's claimed expenses to 1988 dollars and calculated a single present value as of the date of the breach.
Centex claims that Gauthier was not qualified to opine as to which of the County's claimed damages were necessary to conform the buildings to the original plans and specifications. However, Centex did not object to Gauthier's testimony on that basis at trial. The defense objected below only on the grounds that Gauthier's use of the prepared summary of expenses was unfounded and irrelevant. These objections did not adequately apprise the trial judge that Centex believed Gauthier was not qualified to testify as an expert on the County's damages or that he was testifying outside of his area of expertise. Thus, this particular issue was not properly preserved for appellate review. See Steinhorst v. State, 412 So.2d 332, 338 (Fla. 1982)(in order for argument to be cognizable on appeal, it must be specific contention asserted as legal ground for objection below).
Centex further claims that Gauthier's conclusory opinion was based on a predicate consisting of insufficient underlying facts. While it is true that an expert's opinion cannot be utilized to supply substantial facts necessary to support that opinion,
the sufficiency of the facts required to form an opinion must normally be decided by the expert himself because neither trial judges nor appellate judges are usually in a position to determine precisely which facts are dispensable and which are essential to the validity of the opinion reached. Therefore, it is usually up to the opposing side to refute these conclusions, and, unless the omissions are glaring, such deficiencies relate to the weight rather than the admissibility of the expert's testimony. *28 Quinn v. Millard, 358 So.2d 1378, 1382 (Fla. 3d DCA 1978)(emphasis added) (citations omitted), abrogated on other grounds by Ridley v. Safety Kleen Corp., 693 So.2d 934 (Fla.1996). Centex did not refute the adequacy of the data underlying Gauthier's opinions by presenting any experts of its own, and we cannot say with certainty that any omitted data was necessary to the formation of a sound opinion concerning the amount of the County's damages.
Moreover, section 90.705(1), Florida Statutes (1995), provides that:
[u]nless otherwise required by the court, an expert may testify in terms of opinion or inferences and give reasons without prior disclosure of the underlying facts or data. On cross-examination the expert shall be required to specify the facts or data.
Although this provision does not change the rule that an expert opinion is inadmissible if it is based on insufficient data, see Husky Industries, Inc. v. Black, 434 So.2d 988, 993 (Fla. 4th DCA 1983), section 90.705(2) requires the party against whom the expert opinion or inference is offered to establish the insufficiency of the underlying facts or data through a voir dire examination. If the examination establishes prima facie evidence that the expert has not relied on sufficient facts in forming an opinion, the proponent of the evidence must lay an additional foundation that the opinion is adequately based on relevant facts before the opinion is admissible. See § 90.705(2). The record reflects that Centex failed to challenge the factual basis for Gauthier's opinion, either in voir dire or in cross-examination. Therefore, his opinion was admissible to establish the County's damages and was legally sufficient for consideration by the jury in determining the damage award. See City of Hialeah v. Weatherford, 466 So.2d 1127, 1129 (Fla. 3d DCA 1985); Quinn, 358 So.2d at 1382-83. Although Centex repeatedly notes that the prepared summary of expenses which Gauthier used was not admitted into evidence, "there is no requirement that the facts or data underlying an expert opinion be admitted into evidence in order to establish the basis of the opinion." Jackson v. State, 648 So.2d 85, 91 (Fla.1994) (citations omitted).
Despite Centex's primary contention that the County failed to present sufficient evidence to prove its damages, this court has ruled that:
[u]ncertainty as to the amount of damages or difficulty in proving the exact amount will not prevent recovery where it is clear that substantial damages were suffered and there is a reasonable basis in the evidence for the amount awarded. Ultimately the degree of certainty simply requires that the mind of a prudent impartial person be satisfied with the damages.
Adams v. Dreyfus Interstate Dev. Corp., 352 So.2d 76, 78 (Fla. 4th DCA 1977)(emphasis added)(footnote omitted); see also Servpro Indus., Inc. v. Spohn, 638 So.2d 1001, 1003 (Fla. 4th DCA 1994)("a confusing state of financial records does not prevent recovery if there is sufficient evidence from which a damage calculation can be made"). Gauthier's testimony was the only uncontroverted evidence in the record of the County's damages resulting from Centex's breach. The County's unrefuted evidence of its actual costs to remediate, redesign, and reconstruct the buildings, as well as relocate and finance, reduced by the costs for upgrades and improvements, established a sufficient basis to determine damages as of the date of the breach. As there was a reasonable basis in the evidence to support the jury's verdict of $11,550,000, an amount nearly $5,000,000 less than the County's claimed damages, we affirm the trial court's decision to deny Centex's motion for directed verdict on the damage issue.
The Sureties argue that the County's action on the performance bond was time-barred. However, as the parties both agree, the performance bond contained language that made the bond's coverage more expansive than a statutory bond. Therefore, we agree with the trial court's findings that the bond was a common law bond, and that the County's action was timely filed within the five year limitation period in section 95.11(2)(b), Florida Statutes (1995). See Insurance Co. of N. Am. v. Metropolitan Dade *29 County, Florida, 22 Fla. L. Weekly D2499 (Fla. 3d DCA October 29, 1997).
Finally, the Sureties claim that the court's award of prejudgment interest to the County from the stipulated date of breach, December 12, 1988, was erroneous because the County did not incur the majority of its expenses until several years after that date. It is well settled that a party is entitled to prejudgment interest on its "outof-pocket, pecuniary losses" once a verdict has liquidated the damages as of a date certain. Argonaut Ins. Co. v. May Plumbing Co., 474 So.2d 212, 214-15 (Fla.1985); Alvarado v. Rice, 614 So.2d 498, 499 (Fla. 1993). In Pine Ridge at Haverhill Condominium Association, Inc. v. Hovnanian of Palm Beach II, Inc., 629 So.2d 151 (Fla. 4th DCA 1993), we held that a jury verdict awarding damages for construction defects in a condominium complex had the effect of fixing damages as of the date on which the owner turned over the property to the condominium association, and that prejudgment interest was awardable as of that date. Thus, we find that the trial court's award of prejudgment interest from December 12, 1988 was proper because the jury's verdict specifically fixed the County's damages for Centex's breach as of that date. Moreover, we find that the Sureties waived their right to contest the prejudgment interest award because their counsel specifically requested the deflation of the County's damages to 1988 dollars when the County offered to present evidence of its damages in terms of 1996 dollars. See Held v. Held, 617 So.2d 358, 360 (Fla. 4th DCA 1993). Since the Sureties treated the County's losses as occurring in 1988, the County was also entitled to recover prejudgment interest on these damages from 1988.
With regard to the County's point on cross-appeal, we affirm the trial court's reduction of the County's damage award by the $2,750,000 in pretrial settlements received from the architect and masonry construction company. See § 46.015(2), Fla. Stat. (1995)(authorizing set-off of amounts received, pursuant to written release or covenant not to sue in partial satisfaction of damages sued for. against amount of judgment to which plaintiff would be otherwise entitled). We find that the County's claimed damages were not separate and distinct from the damages compensated by its settlements, thereby requiring the court's set-off of the settlement amounts to prevent double recovery. See Raben Builders, Inc. v. First Am. Bank and Trust Co., 561 So.2d 1229, 1231 (Fla. 4th DCA 1990); Kingswharf, Ltd. v. Kranz, 545 So.2d 276, 278 (Fla. 3d DCA 1989).
AFFIRMED.
WARNER and KLEIN, JJ., and PARIENTE, BARBARA, J., Associate Judge, concur.
NOTES
[1] Prior to trial, the County settled with the architect and the concrete and masonry construction company for $2,750,000, and dismissed its negligence claims, in accordance with Florida's economic loss rule.
[2] These defects included the absence of necessary expansion joints in the EIFS system; an inadequate number and improper spacing of EIFS system fasteners; severe rust and water damage of metal studs, fasteners, and other building components; the inadequate attachment of multi-story glass curtain walls; numerous cuts in the curtain wall frames; improper window glass and frame installation; drainage system defects; and over 1,200 potential electrical system defects.
[3] See Frye v. U.S., 293 F. 1013 (D.C.Cir.1923).