DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**BROWARD COUNTY, FLORIDA,**
Appellant,

v.

**CH2M HILL, INC.,** and **TRIPLE R PAVING, INC.,**
Appellees.

No. 4D18-3401

[July 22, 2020]

Appeal and cross-appeals from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Jack B. Tuter, Judge; L.T. Case No. 09-48929 (CACE) 07.

Andrew J. Meyers, Broward County Attorney, Benjamin Salzillo, Rocio Blanco Garcia, Keoki M. Baron, and Joseph K. Jarone, Assistant County Attorneys, Fort Lauderdale, for appellant.

Laura A. Baker of Ferencik Libanoff Brandt Bustamante & Goldstein, P.A. Fort Lauderdale, and E. Britton Monroe and J. Langford Floyd of Lloyd, Gray, Whitehead & Monroe, P.C., Birmingham, Alabama, for appellee, CH2M Hill, Inc.

David J. Metcalf and Megan M. Warren of McRae & Metcalf, P.A., Tallahassee, for appellee, Triple R Paving, Inc.

Curtis L. Brown and J. Michael Moorhead of Wright, Fulford, Moorhead & Brown, P.A., Altamonte Springs, for Amicus Curiae, American Council of Engineering Companies of Florida.

Mike Piscitelli, W. Robert Vezina, III, and Megan S. Reynolds of Vezina Lawrence & Piscitelli, P.A., Fort Lauderdale, for Amicus Curiae, Florida Transportation Builders' Association, Inc.

GROSS, J.

This is a dispute between Broward County, an engineering firm, and a general contractor, arising from a construction project at the Fort

Lauderdale-Hollywood International Airport. After a non-jury trial, the circuit court entered judgment in favor of Broward County.

The County appeals that portion of the final judgment apportioning damages between the engineering firm, the general contractor, and a former party in the lawsuit who had settled with the County before trial. The engineering firm and the general contractor each cross-appeal the final judgment. We affirm the final judgment apportioning damages, but reverse the damage amount, and remand for the circuit court to determine damages.

### *County's Contract with CH2M*

In 1998, the County contracted with the engineering firm CH2M Hill, Inc., for aviation design services for various improvement projects at the Fort Lauderdale-Hollywood International Airport, including the construction of Taxiway C. In 2004, the County and CH2M entered into the Fourth Amendment to their contract, which required CH2M to advance its 95% design for Taxiway C to the 100% completion stage. Under the Fourth Amendment, CH2M was required to "revise the technical specifications in accordance with the latest FAA design circular requirements" and "add FAA technical specifications necessary for the Taxiway C extension." The FAA circulars, in turn, required taxiways to be designed and constructed to receive a useful life of twenty years. Additionally, the Fourth Amendment to the contract removed Project Resident Engineer services and material testing services from CH2M's scope of work.

The site for the construction of Taxiway C had two typical field conditions: (1) the "cut" or "excavation" areas on the project's east side, where the native ground needed to be cut down to the bottom of the subbase and then compacted to a specified density; and (2) the "fill" or "embankment" areas on the project's west side, where the native soil was unsuitable and had to be removed, refilled, and then compacted to the specified density.

CH2M's final design of Taxiway C called for the following layers in the two typical taxiway areas:

| Embankment/Fill Area | Excavation/Cut Area |
|---|---|
| 6" asphalt (P-104 layer) 10" lime rock (P-211 layer) 5" subbase (P-154 layer) | 6" asphalt (P-104 layer) 10" lime rock (P-211 layer) 5" subbase (P-154 layer) |

| | |
|---|---|
| 22" subgrade (P-152 layer – "deep compaction" layer – 100% maximum density)<br>19" subgrade (P-152 layer – 95% maximum density)<br>18" subgrade (P-152 layer – 90% maximum density)<br>16" subgrade (P-152 layer – 85% maximum density) | 22" subgrade (P-152 layer – "deep compaction" layer – 100% maximum density) |

### County's Contracts with Settling Parties

Before construction of Taxiway C began, the County and URS Corporation entered into a contract for URS to serve as Program Manager for the improvement projects at the Airport. As Program Manager, URS was to be the County's on-site representative and was to provide overall management of the Airport's improvement projects. Additionally, the County contracted with the engineering firm Bureau Veritas North America ("BV") for BV to provide quality assurance materials testing and inspecting services for the project, which included density testing of the P-211 (base course), P-154 (subbase), and P-152 (subgrade) layers beneath the P-104 asphalt layer.

### County's Contract with Triple R

In 2005, the County entered into a contract with Triple R Paving, Inc., a general contractor, for construction of the project. The FAA General Conditions were incorporated as a part of the County's contract with Triple R.

Under the contract, the Engineer (i.e., URS) "shall decide any and all questions which may arise as to the quality and acceptability of materials furnished, work performed, and as to the manner of performance . . . of the work."

The contract required Triple R to construct the project in "reasonably close conformity" with CH2M's design plans and specifications. For purposes of the contract, the term "reasonably close conformity" provided the Engineer "with the authority to use good engineering judgment in his/her determination as to acceptance of work that is not in strict conformity but will provide a finished product equal to or better than that intended by the requirements of the contract, plans and specifications." However, the contract also stated that "the term 'reasonably close

conformity' shall not be construed as waiving the Contractor's responsibility to complete the work in accordance with the contract, plans, and specifications." Additionally, other provisions of the contract made clear that Triple R assumed responsibility for its workmanship. Finally, the contract provided: "Failure to reject any defective work or material shall not in any way prevent later rejection when such defect is discovered, or obligate COUNTY to final acceptance."

### *The Premature Failure of Taxiway C and the Ensuing Dispute*

Construction of the project commenced sometime around January 2007. Taxiway C opened to traffic in November 2007. In June 2008, the County first noticed rutting (i.e., indentations in the surface) on Taxiway C. Once the rutting occurred, the County began an investigation into the causes of the rutting.

In an attempt to correct the rutting, the County directed Triple R to mill away two inches of the asphalt surface and fill it with new asphalt.

Triple R achieved substantial completion of the project in September 2008 and final completion in November 2008.

In December 2008, Triple R submitted its final payment application to the County, requesting over $2.9 million in payment. Later that month, URS recommended that the County approve Triple R's final pay application. However, the County never issued a Final Certificate of Payment.

In July 2009, the Contract Administrator at the time, Greg Recht, affirmed to the FAA that the County had "authorized final payment to Triple R" and that "all work in connection with" the Taxiway C project had been "accomplished in reasonable conformance with the plans and specifications."

On August 24, 2009, however, the County received a final report from an engineering consultant regarding the results of its investigation into the causes for Taxiway C's failure. That same day, Recht sent a letter to Triple R in which he stated that the County would seek compensation for issues involving Taxiway C.

In December 2009, a new Contract Administrator sent Triple R a letter stating that the County would release over $2.3 million in payment to Triple R but would retain $600,000 for any necessary repairs attributable

4

to Triple R.  The letter also noted that this amount was not a cap or a floor on any potential exposure.

In 2011, the County hired the engineering firm RS&H to redesign Taxiway C.  The RS&H design was substantially more robust than the CH2M design, which RS&H believed was necessary to achieve a twenty-year expected lifespan for Taxiway C.  After RS&H provided the County with its redesign, a different contractor reconstructed Taxiway C between 2012 and 2013.

The reconstruction of Taxiway C cost the County millions of dollars.

### *The Lawsuit*

In 2009, Triple R sued the County for breach of contract and for violating the Local Government Prompt Payment Act, alleging in both counts that the County withheld payment owed to Triple R.  Triple R also asserted a claim against CH2M for professional negligence in the design of Taxiway C.

The County brought a counterclaim against Triple R for breach of contract and a crossclaim against CH2M for breach of contract and indemnification.  The County alleged that Triple R breached its contract with the County by performing defective work which caused or contributed to the defective construction of Taxiway C, that CH2M breached its contract with the County through "errors, omissions, or defects" in the design of the project, and that CH2M was obligated to indemnify the County for any of its potential liability to Triple R arising out of CH2M's design of the project.

The County also brought claims for breach of contract and indemnification against both URS and BV.  The County's claims against URS and BV were settled at mediation for $600,000 and $125,000, respectively.

Triple R answered and raised the affirmative defense that the County's damages were caused in whole or in part by the County, CH2M, URS, and BV.  CH2M answered and raised the affirmative defenses that fault should be apportioned under section 768.81, Florida Statutes, to Triple R and to various nonparties, including URS and BV.

### *The Trial*

A. The County's Engineering Expert

At trial, the County's engineering expert, Chris Spandau, testified that both CH2M and Triple R contributed to the rutting on Taxiway C.

With respect to CH2M, Spandau testified that CH2M's design deviated from FAA design requirements. Spandau testified that, for the excavation/cut area, CH2M's design did not take into account any of the native, loose soils below the top 22 inches of the subgrade, which was "one of the principal factors" that caused the rutting. Spandau opined that CH2M's design was "doomed to fail." Spandau believed that even if Triple R had followed CH2M's design "to a T," Taxiway C still would have failed.

During CH2M's cross-examination, Spandau agreed that any rutting in the embankment/fill area was the responsibility of Triple R. Spandau also admitted that Triple R did not properly build Taxiway C to CH2M's specifications. Finally, Spandau acknowledged that "we are never going to know" how Taxiway C would have reacted had Triple R built the CH2M design, and that Taxiway C "would have reacted differently" had it been built to CH2M's design.

With respect to Triple R, Spandau testified that Triple R "did contribute to the rutting," but that Triple R's work was a lesser contributing factor to the failure of Taxiway C. Spandau testified that Triple R failed to properly construct the subgrade in accordance with CH2M's design because it did not compact the top 22 inches of the subgrade in both the excavation/cut and embankment/fill areas to maximum dry density, and did not compact the three layers below that level in the embankment/fill areas to the required density. In the 22-inch layer that ran the entire length of Taxiway C, 29 out of 34 (or about 85%) of the density tests showed less than 100% compaction. Triple R also did not achieve 100% compaction in the P-154 layer. And in the embankment/fill areas, there were "essentially 43 inches of uncompacted saturated soil that got dumped in," which did not conform to CH2M's plans or specifications.

B. Triple R's Engineering Expert

Triple R's expert, Randolph Ahlrich, testified that there were two reasons for the premature rutting of Taxiway C: (1) undercompaction and (2) design. Triple R's expert testified that the CH2M design did not meet the standard of care in the excavation/cut areas. However, Triple R's expert testified that the CH2M design in the embankment/fill area met the standard of care, and that any rutting in the embankment/fill area was "probably due to the bridging layer put in by Triple R." If URS did not give Triple R permission to put in the bridging layer, then the rutting in the

6

embankment/fill area was the responsibility of Triple R. However, the embankment/fill area represented only 700 feet of the 3,800 feet that made up the entire length of Taxiway C.

C. <u>CH2M's Engineering Expert</u>

CH2M's engineering expert, Mr. Oakland, testified that "the cause of the rutting was undercompaction of the 22-inch layer."

D. <u>Evidence of URS's Negligence</u>

CH2M's expert in construction management, William McConnell, testified that URS's conduct fell below the standard of care by allowing Triple R to deviate from CH2M's design in various ways. McConnell testified that every time URS allowed a deviation from the design engineer's documents, URS was responsible for the deviation because URS was redesigning the project.

A former URS employee who worked on the Taxiway C project testified that URS was understaffed and did not have the capacity to properly inspect all of Triple R's work.

The County ultimately terminated URS for performance issues in December 2008.

### *The Final Judgment*

The trial court entered a final judgment in favor of the County and against CH2M and Triple R, memorializing the findings it made at the conclusion of trial.

The trial court found that "the redesign and reconstruction of Taxiway C was a direct and proximate result of the breaches of contract by Triple R and CH2M and both are liable for those incidental damages that flow from their breach." The trial court relied "on the testimony of the County's expert, Mr. Chris Spandau" in finding that CH2M breached its contract with the County, and relied on experts from both the County and CH2M in finding that Triple R breached its contract with the County "by failing to build Taxiway C in conformity with not only the specifications, but also the density testing . . . ." The trial court found that "the cause for the failure of Taxiway C in close proximity to its opening to aircraft traffic was a combination of failure to compact correctly and failure to extricate the water from the job site."

The trial court rejected Triple R's negligence claim against CH2M, finding that there was "not competent substantial evidence to support that claim." The trial court also rejected Triple R's Prompt Payment Act claim against the County, finding that "there was a good faith dispute" justifying the County's withholding of $600,000 from Triple R.

The trial court also found that URS, whether due to negligence or breach of contract, was "the main participant on the job site that caused the failure of Taxiway C," as URS was the project manager and had the opportunity to make changes to the plans as well as to the construction. Therefore, the trial court reasoned, "URS was substantially in breach of its contract with the County and at fault for what occurred on Taxiway C."

The trial court found that the County's total damages were $6,723,303, but the court deducted the $725,000 paid by the settling parties, reducing the County's damages to $5,998,303. The trial court then "allocate[d] damages for breach of contract between URS, Triple R, and CH2M" as follows: (1) 60% of the damages to URS; (2) 25% of the damages to Triple R; and (3) 15% of the damages to CH2M.

After factoring in a $600,000 credit to Triple R for the amount the County withheld from Triple R's final payment application, the trial court ordered Triple R to pay the County $899,575.75. As for CH2M, the trial court ordered it to pay the County $899,745.45.

The County appealed the final judgment. CH2M and Triple R both cross-appealed.

### *The circuit court properly apportioned damages pursuant to section 768.81(3), Florida Statutes (2018).*

In its appeal, the County attacks the circuit court's allocation of fault, which placed the bulk of responsibility on the conduct of URS. It argues that comparative fault is not applicable to breach of contract cases and contends that the court should have followed the rule that where separate breaches of contract cause a single, indivisible injury, comparative fault is inapplicable, so that the breaching parties are held jointly and severally liable for the plaintiff's damages.

We reject the County's argument and conclude that section 768.81, Florida Statutes (2018), authorized the circuit court to allocate fault in this case.

8

Section 768.81 is contained in Part II of Chapter 768. In describing the applicability of Part II, the legislature adopted an expansive view that applied the statute to both contract and tort actions, "[e]xcept as otherwise specifically provided." § 768.71(1), Fla. Stat. (2018). That provision states in full: "(1) Except as otherwise specifically provided, this part applies to **any** *action for damages, whether in tort or contract.*" *Id.* (emphasis supplied).

Although section 768.81(3) requires apportionment of damages in "negligence" actions, section 768.81(1) defines negligence in a way that embraces the County's action against CH2M. Subsection 768.81(1)(c) defines a "negligence action" as

> without limitation, a civil action for damages based upon a theory of negligence, strict liability, products liability, *professional malpractice whether couched in terms of contract or tort,* or breach of warranty and like theories. *The substance of an action, not conclusory terms used by a party, determines whether an action is a negligence action.*

(Emphasis supplied).

An engineer is a "professional" within the meaning of subsection 768.81(1)(c). The Florida Supreme Court has acknowledged that persons performing "engineering services are performing professional services, and the law imposes upon such persons the duty to exercise a reasonable degree of skill and care, as determined by the degree of skill and care ordinarily employed by their respective professions under similar conditions and like surrounding circumstances." *Moransais v. Heathman,* 744 So. 2d 973, 976 (Fla. 1999), *receded from on other grounds by Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos.,* 110 So. 3d 399, 407 (Fla. 2013). In the context of the statute of limitations, our supreme court has held that a "profession" means "any vocation requiring at a minimum a four-year college degree before licensing is possible in Florida." *Garden v. Frier,* 602 So. 2d 1273, 1275 (Fla. 1992); *see also Pierce v. AALL Ins., Inc.,* 531 So. 2d 84, 87 (Fla. 1988) ("[F]or purposes of the professional malpractice statute of limitations, we define a profession as a vocation requiring, as a minimum standard, a college degree in the specific field.")[1]; *Pensacola Exec. House Condo. Ass'n, Inc. v. Baskerville-Donovan*

---

[1] The Florida Supreme Court later receded from other language in *Pierce* suggesting that the equivalent of a four-year degree would suffice. *Garden,* 602 So. 2d at 1275.

*Engineers, Inc.*, 566 So. 2d 850, 851 (Fla. 1st DCA 1990) (holding that an engineer is a professional as that term was defined in *Pierce*).

Under the common law of negligence, professionals rendering professional services are required to perform such services "in accordance with the standard of care used by similar professionals in the community under similar circumstances." *Trikon Sunrise Assocs., LLC v. Brice Bldg. Co.,* 41 So. 3d 315, 318 (Fla. 4th DCA 2010). "Where an express provision within a professional services contract provides for a heightened standard of care, however, the professional must perform in accordance with the terms of the contract." *Sch. Bd. of Broward Cty. v. Pierce Goodwin Alexander & Linville*, 137 So. 3d 1059, 1065–66 (Fla. 4th DCA 2014). Thus, "if the professional contracts to perform duties beyond those required by ordinary standards of care, the quality of that performance must comport with the contractual terms." *CH2M Hill Se., Inc. v. Pinellas Cty.*, 698 So. 2d 1238, 1240 (Fla. 2d DCA 1997).

The gravamen of the County's action against CH2M was that CH2M failed to adhere to the contractual standard of care that required it to design a taxiway in accordance with FAA standards. Under subsection 768.81(1)(c), the essence of a professional malpractice action is the breach of a standard of care, whether that standard is derived from the common law or contract. The crucial statutory language is this: "professional malpractice whether couched in terms of contract or tort." *Id.* The County's claims against CH2M were "couched in terms of contract" and fell within the definition of a "[n]egligence action" in the statute.[2]

If the action against CH2M is a subsection 768.81(1)(c) "negligence action," where does that leave Triple R, which is a general contractor, not a professional under that subsection? Section 768.81(3) requires a court to "enter judgment against each party liable on the basis of such party's percentage of fault." Applying a holistic approach to analyzing the complaint, we conclude that the contract action against Triple R fell under the umbrella of the "negligence action" against CH2M, so that the circuit court's allocation of fault was appropriate. *See Martinez v. Miami-Dade Cty.*, 975 F. Supp. 2d 1293, 1296 (S.D. Fla. 2013) (analyzing complaint in its entirety to determine whether it was a section 768.81(1)(c) "negligence action"). After all, Triple R was to perform the contract according to

---

[2] The County relies on *Bre/Cocoa Beach Owner, LLC v. Rolyn Companies, Inc.*, 2012 WL 12905849 (M.D. Fla. 2012), to argue that section 768.81 has no application here. That case is distinguishable because it involved a breach of contract action against a general contractor who performed post-hurricane repairs, not a "professional" such as CH2M.

specifications designed by CH2M, so the causes of action against each were necessarily intertwined. To prove its case against Triple R, the County was required to prove that Triple R's "breach of its contractual responsibilities was a substantial factor in causing the County's extensive damages." *Centex-Rooney Const. Co. v. Martin Cty.,* 706 So. 2d 20, 25 (Fla. 4th DCA 1997). This is compatible with the concept of "fault" that is at the heart of subsection 768.81(3) and parallels the tort notion of a violation of a duty of care that is the proximate cause of damages. Based on the evidence, the circuit court properly allocated fault among all actors whose conduct substantially contributed to the County's damages.

### *Triple R's Challenge to the Measure of Damages*

This brings us to the question of damages. On cross-appeal, Triple R argues, among other things, that the County failed to present evidence of the proper measure of damages, namely, the cost to repair or replace Taxiway C using CH2M's original design.

"The proper measure of damages for construction defects is the cost of correcting the defects, except in certain instances where the corrections involve an unreasonable destruction of the structure and a cost which is grossly disproportionate to the results to be obtained." *Kritikos v. Andersen,* 125 So. 3d 885, 888 (Fla. 4th DCA 2013) (quoting *Temple Beth Sholom & Jewish Center, Inc. v. Thyne Construction Corp.,* 399 So. 2d 525, 526 (Fla. 2d DCA 1981)). Stated another way, "the measure of damages for breaching a construction contract is the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste." *Magnum Constr. Mgmt. Corp. v. City of Miami Beach,* 209 So. 3d 51, 56 (Fla. 3d DCA 2016) (emphasis and internal quotation marks omitted). However, "[i]f in the course of making repairs the owner elects to adopt a more expensive design, the recovery should be limited to what would have been the reasonable cost of repair according to the original design." *Temple Beth Sholom,* 399 So. 2d at 526.

For example, in *Centex-Rooney,* we affirmed a damages award in a construction defect case based upon the plaintiff's "actual costs to remediate, redesign, and reconstruct the buildings, as well as relocate and finance, reduced by the costs for upgrades and improvements." 706 So. 2d at 28. However, in that case, we noted that the plaintiff "did not claim reconstruction expenses for any upgrades or improvements over the original plans and specifications." *Id.* at 27.

11

As an alternative to benefit-of-the-bargain damages, an injured party has a right to damages based on its reliance interest, including expenditures made in performance or in preparation for performance, the recovery of which will place the injured party in the position it occupied before entering into the contract. *Del Monte Fresh Produce Co. v. Net Results, Inc.*, 77 So. 3d 667, 673 (Fla. 3d DCA 2011). However, "[a]ny benefit retained from the expenditures made in reliance on the contract must be offset against the injured party's damages." *Standard Fed. Bank v. United States*, 62 Fed. Cl. 265, 294 (2004) (citation omitted). In other words, a reliance recovery may be reduced to the extent that the breaching party can prove that a "deduction" is appropriate for any benefit received by the injured party. *DPJ Co. Ltd. P'ship v. F.D.I.C.*, 30 F.3d 247, 250 (1st Cir. 1994).

Here, the proper measure of damages under an expectation theory was the cost of repair to bring Taxiway C to its bargained-for state. However, the trial court computed damages based upon the County's expenditures in redesigning and reconstructing Taxiway C in accordance with a completely different design. The new design was more expensive and more robust than CH2M's original design. Accordingly, we conclude that the trial court erred in computing the County's damages based upon an improper measure of the County's expectation interest.

We disagree with Triple R, however, that the proper remedy on appeal is a reversal for judgment in its favor. Even if it was not possible to repair the design defects and construction defects in the original Taxiway C, a viable alternative measure of damages was the County's out-of-pocket costs, less any benefits the County received from the contracts. Thus, although there was no evidence of the County's damages under an expectation theory, the County presented evidence of its reliance damages.

Specifically, the County presented an exhibit showing that its out-of-pocket expenses for the original design and construction totaled $4,770,503. However, during CH2M's cross-examination, the County's damages expert admitted that, if certain deductions were made, including a 23% deduction to account for the percentage of Taxiway C's expected useful life that the County received, the County's out-of-pocket costs related to the original construction of Taxiway C totaled $3,223,301. That said, the County's expert did not concede that each of the proposed deductions was appropriate, only that CH2M's math was correct. Thus, the County's evidence showed that its reliance damages were at least $3,223,301 and were possibly higher.

12

### Conclusion

In sum, we affirm the trial court's allocation of fault, but we reverse on the damages issue raised in Triple R's cross-appeal. On remand, we direct the trial court to make a finding in the first instance as to the County's reliance damages and to enter judgment against Triple R and CH2M based upon the court's previous apportionment of fault.[3]

We affirm without comment on all other issues raised in the cross-appeals.

WARNER and GERBER, JJ., concur.

*     *     *

***Not final until disposition of timely filed motion for rehearing.***

---

[3] Although CH2M did not raise this issue on cross-appeal, we conclude that CH2M necessarily benefits from the reversal on this issue in Triple R's cross-appeal. Section 768.81(3) contemplates a single damage amount to which percentages of fault are applied to craft a final judgment.